F I L E D
**United States Court of Appeals
Tenth Circuit**

**JUN 29 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

STEVEN EDWARD ROOF,

    Defendant-Appellee.

No. 03-2251
(District of New Mexico)
(D.C. No. CR-03-368-MV)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, **HOLLOWAY,** and **MURPHY**, Circuit Judges.

## I.    INTRODUCTION

Defendant-appellee Steven Edward Roof was arrested on February 7, 2003

on an outstanding warrant for a probation violation on a low-level white collar

offense.  During a purported protective sweep of Roof's home, the police saw

evidence that Roof was manufacturing methamphetamine.  Based in part on

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

information discovered during the protective sweep, Drug Enforcement Agency ("DEA") officers obtained a search warrant which led to the seizure of drugs, documents, money, lab equipment, and guns from Roof's home.

On May 14, 2003, a grand jury returned an indictment against Roof, charging him with: (1) possessing, with intent to distribute, 50 grams or more of methamphetamine within 1000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 860(a); (2) maintaining a place for the manufacture, distribution, and use of controlled substances in violation of 21 U.S.C. §§ 856(a)(1) and (b); (3) possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); and (4) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Roof moved to suppress evidence seized during the search of his home and detached garage. Roof argued that the protective sweep was not supported by specific and articulable facts indicating that his home and the detached garage harbored an individual posing a danger to the arresting officers. The district court granted the motion.

The government appeals. Exercising jurisdiction pursuant to 18 U.S.C. § 3731, this court **AFFIRMS** the district court's grant of Roof's motion to suppress.

## II.    BACKGROUND

On August 7, 2002, United States Marshals' Service Deputies received information from DEA Task Force Officer Frank Chavez that federal fugitive Steven Roof was residing at a house at 5512 Delhi NE in Albuquerque, New Mexico. Chavez obtained this information from an unidentified, confidential informant ("CI"). The CI told Chavez that Roof was always heavily armed, was cooking methamphetamine at the house, was teaching others how to make methamphetamine, and was using an alias of "Tim Howard." The government presented no evidence that the informant had any record of reliability.

The informant's tip was not corroborated over the next six months, despite consistent periodic surveillance. No one matching Roof's description was ever seen at the house. License plate checks conducted on vehicles parked outside the house over these six months never showed Roof's name or alleged aliases. The house's utilities were registered to one Lance Beaton. Investigations revealed that Beaton was a real person with no criminal history.[1] Roof's name was not on any of the records associated with the house. Throughout those six months, the surveilling deputies never saw any kind of suspicious activity, nor Roof, in the home.

---

[1]At the suppression hearing, Roof explained that Beaton was his landlord.

On February 7, 2003, deputies John Olsen and Rex Griffith were conducting surveillance of the house. At around 9:00 p.m., the deputies saw Roof step out of the house and drive away in a Porsche. Although the deputies followed Roof to a retail store, they did not follow him all the way back to the house for fear of being exposed. Back at the house, the deputies could not tell if Roof had returned because the garage door was closed and no one could be observed from outside. Deputies Thomas Bauman, Kent Halverson, Lee Boman and Corey Thomas were called to the scene by Griffith as back-ups.

A pick-up truck pulled into the driveway at around 11:30 p.m. Deputy Griffith was unable to see the occupant(s) of the vehicle or whether anyone got out of the truck and entered the house. The district court found that neither Griffith nor any other deputy could tell how many people were in the truck or whether anyone from the truck went into the house. The deputies called the house's listed phone number, but no one answered.

Sounds were emanating from a television, which also caused lights to flicker inside the house. The 36-inch television set was near the front entryway with its side panel immediately visible by anyone standing in the open doorway.

Deputy Bauman decided to enter the home and arrest Roof. Deputies Halverson and Olsen covered the back of the house. Deputies Boman and Griffith approached the front door. Deputies Bauman and Thomas, as well as two

Albuquerque police officers, approached the front of the home from the garage side. Altogether, the deputies and Albuquerque police officers surrounded the home with "enough personnel" to establish "a secure perimeter around all the entry or exit points of the house." Deputy Thomas testified that, while sitting outside the garage door, which was three to four feet from the front door of the house, he detected an odor which he associated, based upon his narcotics training, with methamphetamine. The district court found, however, that the deputies could not smell the methamphetamine from outside the house.

Bauman knocked on the front door and announced that they were police officers with a warrant. The deputies heard some movement or shuffling inside the house. Halverson saw Roof open the rear sliding glass door and ordered Roof to get down. Roof retreated back into the home. Deputies Thomas and Bauman, who were still at the front door, heard Halverson "yell[] that [Roof] was running out the back door" and tell Roof to "get on the ground." Within a minute or so, the front door opened and Roof and one John Essres exited the house. Both men had their hands outstretched, complied with orders to lie on the ground, and were handcuffed without incident. After he exited the house, Essres told the deputies that the pickup truck in the driveway "was his vehicle, and that he [was] the one [who] went in the house."

Deputy Bauman acknowledged that, once Roof and Essres exited, the deputies "did not know whether anybody else was in [the house] or not." Neither the deputies nor the police officers had any information that anyone else was in the home. Thomas testified that the only information the deputies had about anybody being in the house was that "earlier, while doing surveillance in the back, the deputies had seen movement and shadows in the house." Bauman, however, testified that once Roof and Essres exited the house, he "didn't see . . . any other shadows moving around inside or anything."

At the time of Roof's and Essres' arrest, Bauman was "directly in the full visual of the doorway." The door had remained wide open after Roof and Essres exited the house. From his vantage point, Bauman could have seen if anyone remained inside the lighted house. Bauman nevertheless claimed that he could not discern the source of "noises" that were still emanating from the house. The district court, however, found that an officer with Bauman's vantage point should have been able to tell that the noises and lights inside the house were from the television.

Bauman testified that he decided to enter the house to conduct a "protective sweep" because he was concerned that people remained in the home who could have been armed and threatened the deputies' safety. Bauman entered through the front door, followed by Thomas and the two police officers. Inside the living room, the deputies saw, in plain view, "a clump of white chalky substance" which

-6-

appeared to be narcotics, a substantial amount of cash, and a firearm. In a computer room they saw a second firearm. After sweeping the house and finding no one, the officers exited.

Bauman next opened the door of the detached garage, the entrance to which was directly opposite the front entrance of the house, and entered it. Bauman admitted that "[w]e don't know if anybody is in [the garage] or who could be in there." The district court found that Bauman decided to enter the garage merely "because it was an unknown," and had no actual reason to suspect that someone was in the garage or that the garage housed a source of danger to the deputies. After Bauman opened the garage door, both Bauman and Thomas detected a strong chemical odor coming from the garage. Thomas associated the odor with methamphetamine. Bauman conducted a quick sweep of the garage and found no one.

After the officers had already entered the house to conduct the sweep, the Albuquerque police officers searched Roof and Essres. They found approximately $1200 on Roof's person. Roof heard the officers comment that they had found a suspected methamphetamine lab in the house. After the sweep had been conducted, Roof stated that he had cooked methamphetamine in the residence approximately three times within the last month.

The deputies then called DEA officials who obtained a warrant to search the home. The warrant was based in part on the deputies' observations during the

protective sweep and on Roof's statement that he had cooked methamphetamine in the residence within the last month. The search pursuant to this warrant produced numerous items, including material used to manufacture methamphetamine.

## III.  DISCUSSION

This court reviews a district court's factual findings for clear error. *United States v. Mains*, 33 F.3d 1222, 1227 (10th Cir. 1994). A factual finding is clearly erroneous if it is without support in the record or if, after reviewing all the evidence, this court is left with the definite and firm conviction that a mistake has been made. *United States v. Beaulieu*, 893 F.2d 1177, 1182 (10th Cir. 1990). "[T]he credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *United States v. Carter*, 360 F.3d 1235, 1238 (10th Cir. 2004) (quotation omitted). Ultimate determinations of reasonableness under the Fourth Amendment are reviewed *de novo*, viewing the evidence in the light most favorable to the prevailing party. *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998); *Mains*, 33 F.3d at 1227.

Arguments not raised before the district court, on the other hand, are reviewed for plain error. *United States v. Walser*, 275 F.3d 981, 985 (10th Cir. 2001). This court may exercise its discretion to notice the forfeited error if it is

plain and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993).

### 1. *Protective Sweep*

The Fourth Amendment ordinarily requires that officers obtain a warrant before searching a defendant's home or its curtilage. *See Oliver v. United States*, 466 U.S. 170, 180 (1984); *United States v. Cavely*, 318 F.3d 987, 993 (10th Cir. 2003). An exception to this requirement is the protective sweep, which is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The protective sweep must be justified by a reasonable perception, based upon specific and articulable facts, that the area swept harbors an individual posing an immediate danger to the officers or others. *Id.* at 334; *United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994).

The government argues that the district court erroneously granted Roof's motion to suppress. The government claims that the deputies had a reasonable articulable suspicion that after Roof's arrest, persons who could have posed a danger to them remained in the house and garage. This court disagrees.

The deputies did not have specific and articulable facts supporting a reasonable perception that Roof's house harbored an individual posing an immediate danger to them. The government's argument heavily relies on the CI's tip that Roof was cooking methamphetamine in the home, was heavily armed, and

was possibly showing others how to make methamphetamine. This tip, however, was not only six months old, but also completely uncorroborated.[2] Furthermore, both Roof and Essres were completely compliant when, prior to the sweep, they were arrested and handcuffed outside the home. Their compliance made the six-month old tip that Roof was always "heavily armed" even less likely to support a reasonable perception of danger. *See Carter*, 360 F.3d at 1242 (holding that there was no reasonable risk of danger to the police officers when they arrested a combative defendant *outside* his home and had no specific reason to believe that someone had stayed behind).

Moreover, the deputies' uncertainties as to whether anyone remained in the home did not justify the sweep. A mere *absence* of information about whether anyone remains in a home does not justify a protective sweep. *Sharrar v. Felsing*, 128 F.3d 810, 825 (3d Cir. 1997); *United States v. Tabor*, 722 F.2d 596, 598 (10th Cir. 1983) (reasoning that officers are not given free reign to conduct sweep searches on the pretense that a dangerous situation might be imminent). The deputies in this case testified that they did not know whether anyone from the pick-up truck had entered the home. Such lack of information does not constitute

---

[2]The government argues that Thomas' testimony that he smelled methamphetamine while sitting outside the garage corroborated the CI's tip. The district court, however, implicitly discredited Thomas' testimony when it found that the deputies could not smell the methamphetamine from outside the house. This finding is not clearly erroneous. Thus, the government's argument that the CI's tip was corroborated is unavailing.

specific, articulable facts. *Felsing*, 128 F.3d at 825. In addition, from Bauman's vantage point in the doorway, a reasonable officer should have clearly seen that the noises and flickering lights in the home were emanating from a television. As Bauman himself admitted, once Roof and Essres exited the home, the officers no longer saw shadows moving within it. Under such circumstances, the deputies had no specific, articulable facts which would justify a reasonable perception that the home harbored a person posing an immediate danger to them.

Likewise, the deputies did not have a reasonable perception, based on specific and articulable facts, that the garage harbored an individual posing an immediate danger to them. There were no "flickering lights" or "sounds" emanating from the garage. Unlike the open door of the house, the garage door was closed, making it even less likely that a dangerous person would "unexpectedly launch an attack" on the deputies from within. *See Buie*, 494 U.S. at 333. Further, the district court specifically found that Bauman decided to enter the garage merely "because it was an unknown." Nothing in the record indicates that this finding is clearly erroneous. For all these reasons, the protective sweeps of the home and the garage were unjustified and violated Roof's Fourth Amendment rights.

### 2. Exigent Circumstances

The government argues, for the first time on appeal, that the exigent circumstances exception to the warrant requirement applies to this case. The

government argues that the deputies had a reasonable belief, based on specific and articulable facts, that there was evidence of a methamphetamine lab in the house which could be destroyed by people inside it.

Roof correctly notes that the government waived this argument by failing to raise it at the district court. When the government fails to raise an issue below, this court deems it waived on appeal. *See United States v. Swepston*, 987 F.2d 1510, 1516 (10th Cir. 1993). Therefore, this court reviews this argument only for plain error.[3]

The district court did not commit plain error in failing to *sua sponte* analyze whether exigent circumstances justified the sweep of Roof's home and garage. Before an appellate court can correct an error not raised in the district

_____

[3]Roof argues that this argument involves a fact-intensive inquiry which should not be reviewed even for plain error. Plain error review is not appropriate when the alleged error involves resolution of factual disputes. *See United States v. Easter*, 981 F.2d 1549, 1556 (10th Cir. 1992). Indeed, the government's exigent circumstances argument involves the fact-intensive inquiry of whether the deputies reasonably believed that there was a methamphetamine laboratory inside the home and garage, and that persons remained inside the home and garage who could have destroyed this evidence. Within the context of its protective sweep analysis, however, the district court made the factual findings that are needed for the exigent circumstances analysis. The district court found that: (1) the deputies could not smell methamphetamine from outside the home; (2) the deputies had an uncorroborated, six-month old tip from a CI of unknown reliability that Roof was "cooking" methamphetamine in the house; (3) A reasonable officer in Bauman's position would have known that the noises and flickering lights inside the home were emanating from the television; and (4) Bauman entered the garage on the sole basis that it was an "unknown." Because the court made the pertinent factual findings, this court can properly review the exigent circumstances argument for plain error.

court, there must be: (1) an error; (2) that is plain; and (3) that affects substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002). If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

There was no error in this case because there were no exigent circumstances which justified the search of Roof's home and garage. Exigent circumstances justify a warrantless search if: (1) the deputies had reasonable grounds to believe that there is an immediate need to protect their lives or property, or the lives or property of others; (2) the search is not motivated by an intent to arrest and seize evidence; and (3) there is some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched. *United States v. Rhiger*, 315 F.3d 1283, 1288 (10th Cir. 2003). Threats to public safety, such as explosive and toxic methamphetamine labs, can constitute an exigent circumstance which justifies a warrantless search. *Id.* at 1288, 1290-91.

The deputies had no reasonable basis, much less a basis approaching probable cause, to believe that Roof's home and garage contained a methamphetamine lab which posed an immediate danger to public safety or which could have been destroyed by persons within it. The government correctly argues that the detection of the odor of methamphetamine by a law enforcement officer,

-13-

when coupled with other relevant facts, can support an exigency argument. *Rhiger*, 315 F.3d at 1291 n.4. As noted previously, however, the district court specifically found that the deputies could not smell methamphetamine from outside. The only information the deputies had which associated methamphetamine with the house was a six-month old, uncorroborated tip from a CI whose reliability was unproven. Under these circumstances, the officers did not have a reasonable basis to believe that Roof's home and garage contained a methamphetamine lab.

For the previously stated reasons, the deputies did not have a reasonable basis to think that anyone remained inside the home or the garage. Thus, they did not have a reasonable basis to fear the destruction of evidence of criminal activity. Therefore, the district court committed no error, much less plain error, in failing to *sua sponte* raise an unmeritorious, exigent circumstances argument on the government's behalf.

### 3. Inevitable Discovery

Finally, the government argues that the district court committed plain error[4] in suppressing the evidence because it would have been inevitably discovered through lawful means. The government contends that, even without the information discovered during the warrantless sweep, the affidavit contained

---

[4]This argument was not presented to the district court. The government concedes that it is reviewed for plain error.

sufficient probable cause to support the search warrant. It in turn argues that the search warrant would have led to the inevitable discovery of the evidence suppressed.

The district court did not err, much less commit plain error, in failing to *sua sponte* consider whether the evidence in this case would have been inevitably discovered. While it is true that evidence can be properly admitted if an independent investigation would have inevitably led to the discovery of that evidence, *United States v. Souza*, 223 F.3d 1197, 1202-03 (10th Cir. 2000), the evidence in this case would not have been so discovered. The government's inevitable discovery theory requires that the affidavit, stripped of the evidence obtained during the unconstitutional sweep, establish sufficient probable cause to support the search warrant. *See United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

The affidavit in this case, when purged of its tainted testimony, does not establish probable cause for a search warrant. An affidavit establishes probable cause for a search warrant if the totality of the information contained therein establishes "the probability that evidence of criminal activity would be located in the desired search area." *United States v. Wittgenstein*, 163 F.3d 1164, 1171 (10th Cir. 1998). When purged of the illegally obtained information, the affidavit in this case only establishes that: (1) in August 2002, a CI told the DEA that Roof lived at 5512 Delhi NE, was known to carry firearms, and was making

-15-

methamphetamine in the house; (2) on February 7, 2003, Roof was seen leaving the home, driving to Lowe's hardware store, and returning to the home when he saw that Lowe's was closed; (3) that same night, a brown pickup truck pulled into Roof's driveway and at least one male subject entered the residence; and (4) shortly thereafter, deputies arrested Roof outside the home on a probation violation warrant, and a male subject, Essres, also surrendered himself to the deputies.[5]

The CI's six-month old tip does not, in conjunction with the other evidence in the affidavit, establish probable cause for the search warrant. An informant's tip can establish probable cause if, in the totality of circumstances, there is some indication of its reliability. *See Illinois v. Gates*, 462 U.S. 213, 230-32 (1983). Relevant considerations in determining the overall reliability of the informant's tip include: (1) independent corroboration of the tip; (2) whether the CI is known to have provided reliable information in the past; and (3) whether the CI has stated the basis for the tip. *See id.* at 232 n.7, 233-34, 238-39; *United States v.*

---

[5]The government urges this court to consider, in its inevitable discovery analysis, that "Deputy Thomas smelled methamphetamine coming from the house" while sitting outside the garage. This is unavailing for two reasons. First, the district court specifically found that the deputies could not smell methamphetamine from outside the house. This finding, which involves an implicit credibility determination, is not clearly erroneous. *See Carter*, 360 F.3d at 1238. Second, the affidavit contained no statement that Thomas smelled methamphetamine while sitting outside the house. This court declines the invitation to rewrite the affidavit on appeal in order to consider whether it establishes probable cause.

*Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). The affidavit in this case does not state that the CI had ever before provided reliable information to law enforcement officers. Except for Roof's mere presence at the house on February 7, 2003, the affidavit neither states the CI's basis for his tip nor mentions any facts that corroborate the CI's tip. Under such circumstances, the CI's tip is not sufficiently reliable to establish probable cause.

In an attempt to salvage its argument of plain error, the government urges this court to consider the statement made by Roof, which was included in the affidavit, that he had cooked methamphetamine in the house three times within the past month. Roof urges this court not to consider his statement, arguing that it is the fruit of the Fourth Amendment violation because he made it after he had seen the deputies enter his home.

This court declines to consider Roof's statement in its analysis of whether the affidavit establishes probable cause for a search warrant. Evidence derived from an illegal search can be suppressed as the "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984). Derivative evidence need not be suppressed if the connection between the illegal police conduct and the challenged evidence is "so attenuated as to dissipate the taint." *Id.* at 805 (quotation omitted). Prior to making the contested statement, Roof had been handcuffed and arrested. Roof made the contested statement shortly after seeing the deputies go through his house and hearing the police officers claim to have

found a methamphetamine lab within it. His statement was therefore not so attenuated from the illegal sweep as to dissipate the taint. Because this court can only consider the parts of the affidavit that are purged of the unlawfully obtained information, *see Snow*, 919 F.2d at 1460, it declines to consider Roof's statement in analyzing whether the affidavit established probable cause for the search warrant.

Because the affidavit, when purged of its tainted testimony, does not establish probable cause for a search warrant, the inevitable discovery rule does not render the suppressed evidence admissible. Therefore, the district court did not commit plain error in failing to *sua sponte* consider this theory.

## IV. CONCLUSION

For the foregoing reasons, this court **AFFIRMS** the district court's grant of Roof's Motion to Suppress.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge
