**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 17, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

STEPHEN M. NELSON,

     Defendant - Appellant.

No. 16-3292

———————————————————

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:15-CR-20080-JAR-1)**
———————————————————

Daniel T. Hansmeier, Appellate Chief (Melody Brannon, Federal Public Defender, and Tim Burdick, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Kansas City, Kansas, for Defendant-Appellant.

James T. Ward, Special Assistant United States Attorney (Thomas E. Beall, United States Attorney, with him on the brief), Office of the United States Attorney, Kansas City, Kansas, for Plaintiff-Appellee.

———————————————————

Before **TYMKOVICH**, Chief Judge, **MATHESON** and **MORITZ**, Circuit Judges.

———————————————————

**MORITZ**, Circuit Judge.

———————————————————

     After seven law enforcement officers arrested Stephen Nelson in a private residence, one officer continued searching the residence and found two firearms. The government attributed the firearms to Nelson, and he was indicted for possession of a

firearm by a felon. *See* 18 U.S.C. § 922(g)(1). Nelson moved to suppress the firearms, arguing that the officers violated the Fourth Amendment by continuing to search the residence after arresting him. The district court denied Nelson's motion, concluding that the post-arrest search was a valid protective sweep because the officers "could have reasonably believed that someone other than [Nelson] was hiding in the house." R. vol. 1, 95.

Nelson entered a conditional guilty plea, and he now appeals the district court's order denying his suppression motion. We vacate the denial based on our conclusion that the searching officer had no basis to reasonably believe that an unknown, dangerous person was hiding in the residence. Nevertheless, we remand for the district court to determine, in the first instance, whether the owner of the residence consented to the search.

# I

While Nelson was serving a term of supervised release, his probation officer obtained an arrest warrant based on Nelson's alleged failure to comply with several conditions of that release. Although the probation officer indicated that Nelson's whereabouts were unknown, the United States Marshals Service learned that Nelson occasionally stayed at a house owned by Antonio Bradley. Nelson had a small child with Bradley's daughter, Allie, who lived with her parents.[1] Deputy Marshal Jovan Archuleta asked Bradley to contact him if Nelson appeared at the Bradley residence.

---

[1] To avoid confusion, we refer to Antonio Bradley as "Bradley" and to Allie Bradley as "Allie."

Bradley did exactly that. On May 2, 2015, he told Archuleta that Nelson was in the Bradley residence and that the deputy marshals could "go inside and search for" Nelson. R. vol. 2, 36. Three deputy marshals—Chris Johnson, Bradley Owens, and Michael Thibault (collectively, the deputies)—formed a task force to execute the arrest warrant with four Kansas City, Kansas police officers. The deputies drove to the Bradley residence and knocked and announced at the front door.

After a minute or so of knocking, Allie opened the door. When the deputies informed Allie of their intent to arrest Nelson, she responded that he was upstairs. Allie said that she would retrieve Nelson herself and then attempted to shut the door on the deputies. But Johnson prevented Allie from doing so, and the deputies entered the residence.

The Bradley residence has four levels. The deputies entered at the third level, which consists of a living room, a dining room, and a kitchen. The fourth level, where Allie asserted Nelson was located, contains three bedrooms. The second level consists of a family room and a garage. From there, a set of stairs descends into a subbasement area—the first level.

Upon entry, the deputies cleared the third level. The deputies then shouted upstairs, instructing Nelson to show himself. Meanwhile, Thibault and Owens escorted Allie to the second level so that she could retrieve her child. After clearing that level, Thibault and Owens moved to the top of the stairs leading down to the first level. That's when Thibault saw movement on the first level.

From the top of the stairs, Thibault shouted commands for the unidentified person to come out and show his hands. After ten seconds of shouting, Nelson came around the corner with his hands in the air. Thibault and Owens instructed Nelson to walk up the stairs to the second level and placed him in custody there. Owens then descended the stairs to search the first level. There, he found two firearms underneath a pile of clothes on a bed. Each of the Bradleys disavowed knowledge and ownership of the firearms.

Because Nelson had two previous felony convictions, the government charged him with possession of a firearm by a felon. Nelson moved to suppress the firearms, arguing that the deputies violated the Fourth Amendment by continuing to search the residence after arresting him. In response, the government made two arguments relevant on appeal: (1) Bradley, the owner of the residence, consented to the search; and (2) Owens lawfully searched the first level under the protective-sweep doctrine set forth in *Maryland v. Buie*, 494 U.S. 325 (1990).

In *Buie*, the Court recognized two exceptions to the general rule that police must obtain a warrant to search a home. Under the first exception (Prong One) the police may, in conjunction with an arrest in a home, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id*. at 334. Under the second exception (Prong Two), police may conduct a "protective sweep" *beyond* areas immediately adjoining the arrest if there are "articulable facts which, taken together with the rational inferences from those facts,

4

would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 335.

Citing Prong Two, the district court concluded that the facts surrounding Nelson's arrest "would support a reasonable belief that someone else was in the house who could pose a danger to the [deputies] or others." R. vol. 1, 94. Thus, the district court concluded that Owens conducted a valid protective sweep and denied Nelson's motion to suppress on that basis. Nelson appeals.

## II

On appeal, Nelson argues that the district court erred in relying on Prong Two to deny his motion because the deputies had no reason to believe that a dangerous third person was hiding in the residence. The government defends the district court's reasoning and asserts three alternative grounds for affirming: (1) under Prong One, the deputies lawfully searched the first level because that area immediately adjoins the place of Nelson's arrest; (2) the good-faith exception to the exclusionary rule applies; and (3) Bradley consented to a search of the entire residence. In reviewing these arguments and the district court's denial of Nelson's motion, we examine the district court's factual findings for clear error and its application of the relevant legal standards de novo. *See United States v. Hauk*, 412 F.3d 1179, 1185 (10th Cir. 2005).

## A

The district court concluded that Deputy Owens lawfully conducted a protective sweep of the first level because, under Prong Two, the deputies could have

reasonably believed that "someone else [aside from Nelson] was in the house who could pose a danger to the [deputies] or others." R. vol. 1, 94. We disagree.

The district court relied on three facts in reaching its conclusion: (1) Allie attempted to shut the front door on the deputies; (2) Allie incorrectly informed the deputies that Nelson was upstairs, on the fourth level, when in fact he was on the first level; and (3) Nelson failed to immediately show himself to the deputies when they instructed him to do so. But these facts don't create an inference that someone other than Nelson was hiding in the house, whether the three facts are taken separately or together.

Nor does the government explain how these facts create the necessary inference. Instead, the government resorts to a fallback position—that "the officers had no way of knowing if anyone else was in the residence." Aplee. Br. 29. But for the following reasons, that argument turns Prong Two on its head.

Under Prong Two, the government is required to articulate specific facts giving rise to the inference of a dangerous third person's presence. *See* 494 U.S. at 337. As we've previously explained, "there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course . . . ." *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004); *see United States v. Roof*, 103 F. App'x 652, 658 (10th Cir. 2004) (unpublished) ("A mere *absence* of information about whether anyone remains in a home does not justify a protective sweep."). In short, "'[n]o information' cannot be an articulable basis for a sweep that

6

requires information to justify it in the first place." *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996). Accordingly, if the deputies had no knowledge regarding the potential presence of a third person, then the government is per se unable to make the affirmative showing that *Buie* requires.

Our prior decisions in this area illustrate the type of specific, articulable facts that might reasonably suggest the presence of an unknown, dangerous person. *See, e.g.*, *United States v. Denson*, 775 F.3d 1214, 1219-20 (10th Cir. 2014) (affirming validity of Prong Two protective sweep based on specific information that "a second person lived in the home who was wanted on an outstanding warrant"); *Hauk*, 412 F.3d at 1192 (concluding that police "had a reason to suspect that there was an unidentified person lurking somewhere in the house" because while police were waiting outside house, third party drove up and appeared to enter house); *United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003) ("When [arresting officers] asked if anyone else was in the house, [arrestee] told them he had 'a friend' inside."). In contrast with the facts in those cases, the three facts the district court identified here are self-evidently insufficient under *Buie*.

The government, perhaps recognizing as much, asserts that two additional facts support the inference that a dangerous third person was hiding in the residence. First, the government points to the district court's statement that "Thibault noticed shadows moving at the bottom of the stairs in the [first level]." R. vol. 1, 89. But we decline to address this argument because the government's brief entirely fails to explain the significance of this putative fact. *See Bronson v. Swensen*, 500 F.3d 1099,

7

1105 (10th Cir. 2007) (explaining that "cursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary to avoid application of the [waiver] doctrine").

The government asserts that a second additional fact supports this inference: Allie informed the deputies that her cousin was in the house. That's precisely the sort of specific, articulable information that might have permitted Owens to search the first level after arresting Nelson. For that information to be relevant, of course, Owens had to have it *before* he conducted the protective sweep. But as the government acknowledges, the district court expressly declined to decide "whether the [deputies] learned about the cousin before they performed the search of the [first level]."[2] R. vol. 1, 95 n.19.

Because this question of timing is material, we would ordinarily remand for the district court to make a factual finding. *See United States v. Ramstad*, 219 F.3d 1263, 1265 (2000). But here, the government has conceded—both below and on appeal—that Owens didn't "find out" about Allie's cousin until after he searched the

---

[2] The district court stated that the chronology of Allie's statements about her cousin was "unclear." R. vol. 1, 95 n.19. But the court's own recitation of facts seems to clearly indicate that Allie told the deputies about her cousin after Nelson's arrest and, at the earliest, contemporaneously with Owens' protective sweep. According to the district court, "Johnson patted [Nelson] down for weapons, but found none. Allie *then* explained to Johnson and Thibault that her sixteen-year-old cousin was also in the house . . . . *Meanwhile*, Owens entered the subbasement and began searching for other people who could pose a potential threat to the officers." *Id.* at 89-90 (emphases added).

first level.[3] Aplee. Br. 6. Accordingly, the government has conceded any argument that Owens' knowledge of the cousin's potential presence justified the protective sweep. *See Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993) (noting that statements in briefs and at oral argument may, in court's discretion, operate as judicial admissions that "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact" (quoting *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988))), *rev'd in part on reh'g sub nom. Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078 (10th Cir. 1994) (en banc).

Because neither the district court's three facts nor the government's two additional facts permitted Owens to infer that a dangerous third person was hiding in the Bradley residence, the first-level search was not a valid protective sweep under Prong Two.

**B**

The government argues that we may nevertheless affirm the district court's denial of Nelson's suppression motion on an alternative ground: Prong One. In conjunction with an arrest in a home, the police may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces

---

[3] After making this same concession at oral argument, the government insisted that Johnson's pre-search knowledge of the cousin's potential presence was imputed to Owens through the collective-knowledge doctrine. As Nelson points out, that doctrine would apply only if Johnson instructed Owens to conduct the protective sweep. *See United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). There's no evidence of any such instruction.

immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. The government asserts that Prong One validates the first-level search under two theories: (1) the deputies arrested Nelson on the first level, so the search of the bed on that level occurred immediately adjacent to the arrest; and (2) even if the deputies arrested Nelson on the second level, the first level nevertheless immediately adjoins the second level. But the government concedes that it failed to make these specific arguments below. And Nelson argues that we should decline to consider them on that basis.[4]

We generally don't "address arguments presented for the first time on appeal." *United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002). Nevertheless, the government correctly notes that we have discretion to affirm on alternative grounds "when the record below is sufficient to permit us to conclude, as a matter of law, that [d]efendant's Fourth Amendment rights were not violated." *United States v. Mosley*, 743 F.3d 1317, 1324 n.2 (10th Cir. 2014). But the record lacks the necessary factual findings for us to do so here. In particular, the district court made no findings regarding the proximity of the location of Nelson's arrest to the area that Owens

---

[4] The government asserted at oral argument that its Prong One arguments are functionally similar to its argument below that Owens' sweep was a valid search incident to Nelson's arrest. But to the extent the government intended to suggest that the latter argument preserved the former for appeal, we disagree; our general rule against considering new arguments on appeal applies equally when "a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial." *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993). Moreover, because the government failed to raise this point before oral argument, we deem it waived. *See Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1292 n.10 (10th Cir. 2017).

ultimately searched. We therefore decline to consider the government's Prong One arguments. *See Brown v. Perez*, 835 F.3d 1223, 1237 (10th Cir. 2016) (declining to consider newly raised argument that "turn[ed] in substantial part on a question of fact").

C

Next, the government urges us to affirm the district court's order under the good-faith exception to the exclusionary rule. *See United States v. Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006) (explaining that suppression isn't appropriate when officer relies in good-faith on a third party's mistake). Specifically, the government argues that Owens' search "was close enough to the line of validity that an objectively reasonable officer would have acted" in the same way. Aplee. Br. 39.

But again, the government concedes that it failed to raise this argument below. And we decline to consider it because the record lacks factual development on key issues. *See Brown*, 835 F.3d at 1237. For instance, Nelson argues that we should decline to apply the good-faith exception here because the deputies acted pursuant to "a general policy of indiscriminate and unconstitutional protective sweeps during in-home arrests." Aplt. Br. 23. But the scope of that policy isn't entirely clear from the deputies' testimony. In particular, we can't be certain whether it calls for *post*-arrest protective sweeps for potential third parties. And the district court made no such findings.[5]

---

[5] Thibault, the Marshals' supervisor in Kansas City, Kansas, testified without prompting at the suppression hearing, "Once we make entrance into the residence,

11

In any event, even if we considered the government's new argument, we would reject it on the merits. We've previously explained that the Supreme Court has "limited [the good-faith] exception to circumstances where someone other than a police officer has made the mistaken determination that resulted in the Fourth Amendment violation." *Herrera*, 444 F.3d at 1249. Because the government neither suggests that the deputies relied on a third party's mistake—a wrongly issued search warrant, for instance—in deciding to search the first level, nor explains why this case might present the "very unusual circumstances" that would convince us to "extend th[e] good-faith exception beyond its pedigree," *id.* at 1253, we decline to affirm on this basis.

## D

Finally, the government argues that we should affirm the district court's order because Bradley consented to a search of his entire residence. Nelson, in contrast, argues that the deputies reached the limit of Bradley's consent when they found and arrested Nelson. The district court expressly declined to decide this issue.

There's no dispute that Bradley authorized the deputies to enter his residence in order to arrest Nelson. The question is whether Bradley's limited consent extended

---

we're going to check everywhere that a body could be." R. vol. 2, 80. And he testified that this is a "blanket safety rule" that applies "on any occasion in which [he] mak[es] an arrest" in a residence. *Id.* at 98. We note that if, as Nelson suggests, the United States Marshals Service for the District of Kansas maintains a practice that systemically ignores the framework set forth in *Buie,* such a practice would be troubling. As we explained in another case concerning law-enforcement officials in the Kansas City area, "The Fourth Amendment does not sanction automatic searches of an arrestee's home, nor does the fact-intensive question of reasonable suspicion accommodate a policy of automatic protective sweeps." *Hauk*, 412 F.3d at 1186.

beyond that purpose, authorizing the deputies to indiscriminately search the residence after the arrest. Bradley testified about the scope of his consent as follows:

> Q. Okay. So you gave the U.S. marshals permission to go inside your house?
>
> A. Uh-huh.
>
> Q. And did you give the U.S. marshals permission to go in there and search for him and try to find him?
>
> A. Yeah. I told them they can go find him. He's in my house.

R. vol. 2, 17.

This testimony suggests that Bradley consented for the deputies to search his house only to the extent necessary to find and arrest Nelson. With some prompting, however, Bradley agreed that the scope of his consent "included anything that [the deputies] needed to reasonably do to safely arrest" Nelson. *Id.* at 18. But Bradley never stated whether that license extended beyond the time of Nelson's arrest.

We won't decide this issue in the first instance on appeal. "Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous." *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990). Although the government raised this argument below—unlike its Prong One and good-faith arguments—the district court declined to conduct the fact finding necessary for us to resolve this issue on appeal. We therefore remand for it to do so. *Ramstad*, 219 F.3d at 1265.

13

\*   \*   \*

We vacate the district court's order denying Nelson's motion to suppress and remand for the district court to determine, on the basis of the evidence already in the record, whether the deputies exceeded the scope of Bradley's consent when they continued searching his residence after they arrested Nelson.