**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL EUGENE BANKS, a/k/a Bird,
a/k/a Birdie, a/k/a Tiny Bird,

    Defendant - Appellant.

No. 16-6322

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:15-CR-00093-M-4)**
_____

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant.

David McCrary, Assistant United States Attorney (Mark A. Yancey, United States
Attorney, with him on the briefs), Office of the United States Attorney, Western District
of Oklahoma, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

    A jury convicted Michael Banks of sixteen drug-related crimes, and the district

court sentenced him to life in prison plus 60 months. This is Banks' direct appeal.

For the reasons explained below, we affirm his convictions and sentence.

BACKGROUND

In the fall of 2014, law enforcement obtained information suggesting that members of the Rollin 90s Crips, led by Daryl Ingram, were manufacturing and distributing cocaine base in Oklahoma City. As a result, the Oklahoma City Police Department, the FBI, the United States Postal Service, and the IRS launched a joint investigation into the gang's activities. That investigation resulted in a 24-count indictment against Banks, Ingram, Anthony Anderson, Michael Brown, and Xavier Guerrero. In part, the indictment alleged two related conspiracies: (1) conspiracy to possess with intent to distribute cocaine base and (2) conspiracy to launder the drug-trafficking proceeds. The remaining counts alleged that Banks, Ingram, and Anderson individually committed various gun, drug, money-laundering, and witness-tampering offenses.

The evidence at trial was compelling. Three former gang members testified that Banks and Ingram were members of the Rollin 90s. Travel records and photographs showed that these men were connected to one another. Banks' mother testified that she assumed Banks sold drugs for a living. Two witnesses reported seeing Banks with cocaine base in a hotel room near Penn Square Mall. And Banks was arrested twice in 2014 at houses where law enforcement discovered large amounts of cocaine base. Banks' non-conspiracy convictions stemmed from these two arrests.

The first of these two arrests took place in July, during a consensual search of Lillie Nelson's Oklahoma City home. At the time of the search, Banks was standing

just inside the closed door of Nelson's son's bedroom, along with Nelson's son, Willie Evans, and one other man. The officer who searched that bedroom found two guns in a reclining chair and ammunition in a shoebox in the closet. Also in the closet, near the bottom of a nearly full clothes hamper, he found a Crown Royal bag containing $1,500 in cash, three baggies containing a total of 130 grams of cocaine base, and one baggie of cocaine powder weighing approximately five grams. Evans claimed responsibility for the guns and drugs found in his room. But in recorded jail calls, Banks implied that the drugs were his; he told his mother that Evans took responsibility for "all that shit, my shit." R. vol. 3, 570–71. This first arrest led to Banks' conviction for possession of cocaine base with intent to distribute.

The second of Banks' two arrests took place in November 2014, at a house in Spencer, Oklahoma. Officers obtained an arrest warrant for Banks in mid-November and received information on November 28 that Banks had threatened to shoot one of the government's informants. Based on this threat, law enforcement obtained a state-court order authorizing T-Mobile to gather data from Banks' cell phone and asked T-Mobile to ping[1] Banks' cell phone and determine its location. T-Mobile did so, and

---

[1] The term "ping" can mean different things in different contexts. It sometimes refers "to a cell phone's connecting to a cell tower," a connection that generates cell-site location information (CSLI). *United States v. Riley*, 858 F.3d 1012, 1014 n.1 (6th Cir. 2017), *petition for cert. filed* Sept. 12, 2017 (No. 17-5943). It can also mean "a service provider's act of proactively identifying the real-time location of the cell phone" by using GPS data. *Id.* Here, the state-court order both (1) required disclosure of historical CSLI and (2) permitted real-time tracking. But the only action that actually occurred was T-Mobile's use of GPS data to "ping" Banks' cell phone and determine his real-time location. Thus, we use the term "ping" to refer to real-time tracking.

that led law enforcement to the Spencer house. When the officers arrived, the individuals in the house initially barricaded themselves inside. After about an hour, Banks came out and surrendered peacefully, along with his two girlfriends, Satin Watley and Gabrielle Stevenson, and his infant child.

The officers then entered the house and conducted a protective sweep, looking for one of Banks' coconspirators. The coconspirator wasn't there. But during the sweep, officers saw a variety of evidence in plain view. These events led to Banks' convictions for possessing cocaine with intent to distribute, manufacturing cocaine base, possessing a gun in furtherance of a drug crime, and being a felon in possession of a gun.

Regarding the money-laundering charges, trial testimony established that Banks often asked his girlfriends and mother to buy money orders or make deposits with cash that he gave them. For instance, Stevenson testified that Banks gave her thousands of dollars in cash and asked her (1) to buy money orders and send them to California and (2) to deposit money into a specific bank account. Watley likewise testified that she made at least four cash deposits into a particular bank account at Banks' direction. And Banks' mother testified that she bought four money orders at Banks' direction to send to California. She said that Watley accompanied her to the post office to buy the money orders, provided the money from Banks, and gave her the California address.

Banks, Ingram, and Brown were tried as codefendants. The government presented testimony from (1) various law-enforcement officers who participated in

4

the investigation, (2) former gang members, (3) Banks' mother, (4) both of Banks' girlfriends, and (5) some of the individuals in California who received the money orders and deposits. The jury convicted Banks of 16 of the 18 charges against him, and the district court sentenced him to life in prison plus 60 months.[2] Banks now appeals, challenging his convictions and his sentence.

## ANALYSIS

### Suppression Issues

Banks first argues that the district court should have suppressed the evidence found at the Spencer house after his second arrest because (1) the state court issued his arrest warrant without probable cause, (2) the state court issued the ping order without probable cause, and (3) law enforcement performed an unjustified protective sweep of the Spencer house after arresting him. We review the district court's factual findings on suppression motions "for clear error, viewing the evidence in the light most favorable to the government," but we review de novo the district court's ultimate determination of whether probable cause supported a search or seizure. *United States v. Hauk*, 412 F.3d 1179, 1185 (10th Cir. 2005).

#### *Arrest Warrant*

"[A]n arrest warrant must be supported by probable cause to comply with the Fourth Amendment." *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996). When a court determines that probable cause exists, the reviewing court's task "is merely to ensure the [g]overnment's affidavit provided a 'substantial basis' for

---

[2] The jury also convicted Ingram and Brown; they have appealed separately.

reaching that conclusion." *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)).

Here, Matthew McRorie, a detective with the Oklahoma City Police, asked the state court to issue an arrest warrant for Banks on charges of conspiring to commit aggravated drug-trafficking, conspiring to commit aggravated manufacturing, and conspiring to traffic cocaine base. McRorie's affidavit provided an overview of the investigation and identified Ingram as the leader of the Rollin 90s and the gang's related drug-trafficking organization. Three confidential informants provided consistent reports about the drug-trafficking organization, and two of them identified Banks as a member just underneath Ingram in that organization's hierarchy. McRorie's affidavit also included details about Banks' July 2014 arrest, including that Banks made a call from jail to discuss having Ingram bail him out. Based on McRorie's affidavit, the state court issued an arrest warrant for Banks. When Banks challenged this arrest warrant before trial, the federal district court found that the state court had a substantial basis for concluding that there was probable cause for the warrant.

Banks argues that the affidavit didn't establish probable cause because (1) it included information from one reliable informant who didn't identify Banks as being involved in the conspiracy, (2) it included information from two other informants who did identify Banks as being involved but who had no "track record" of reliability, Aplt. Br. 20, and (3) law enforcement didn't independently corroborate

6

the informants' information by conducting a controlled drug deal with Banks. As we explain, these arguments fail.

"Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). When deciding whether probable cause exists, a court must consider the totality of the circumstances, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238. At the same time, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000). No particular method of corroboration is required "so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *United States v. Mathis*, 357 F.3d 1200, 1204 (10th Cir. 2004) (quoting *Jones v. United States*, 362 U.S. 257, 269 (1960)).

Here, the statements from the three informants corroborated each other. *See id.* at 1206 (discussing sufficiency of statements from three cooperating witnesses and noting, in part, "that the information provided by the informants was internally corroborated in several respects"). All three informants identified Ingram as the leader of the drug-trafficking organization and identified Aundre Cade, Tyree Cade, and Gilbert Jacobs as lower-level members. The first and third informants additionally identified Leedarran Cargle and Christopher Little as younger, lower-level members. And the second and third informants both identified Banks as part of

7

the organization's leadership. Banks correctly notes that the first informant, the only one with an independent track record of reliability, didn't specifically identify Banks. But that's not determinative where, as here, the two other informants did identify Banks and all three informants provided similar and overlapping information. *See, e.g.*, *United States v. Le*, 173 F.3d 1258, 1266 (10th Cir. 1999) (noting that consistency in reports from independent informants validates those reports).

In addition to this internal corroboration, McRorie's affidavit also demonstrated that law enforcement officers independently investigated several aspects of the informants' statements. For example, the third informant reported that Aundre Cade hid drugs for Ingram at a specific apartment. Law-enforcement officers (1) confirmed that Cade leased the identified location, (2) installed a surveillance camera outside that location, and (3) confirmed the third informant's report that Ingram visited that location almost every day.

It is true, as Banks points out, that the officers didn't conduct any controlled drug purchases. And statements from informants "*may* be corroborated through the arrangement of a controlled purchase." *United States v. Nelson*, 450 F.3d 1201, 1214 (10th Cir. 2006) (emphasis added) (quoting *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004)). But officers need not "corroborate information received from an informant through personal observation." *Mathis*, 357 F.3d at 1204. "Rather, an officer simply must have knowledge of other matters that reasonably corroborate the informant's statements." *Id.* Thus, the officers weren't *required* to arrange controlled purchases. It's enough that (1) the officers knew the informants corroborated each

8

other and that (2) the officers then independently corroborated certain details from the informants. Accordingly, the district court correctly rejected Banks' assertion that the affidavit rested on unreliable, unverified statements from confidential informants.

Next, Banks argues that McRorie intentionally or recklessly omitted from his affidavit critical information regarding Banks' July 2014 arrest. Specifically, he points out that while McRorie noted that Banks was found in a bedroom in which officers also discovered over 100 grams of cocaine base, the affidavit failed to mention that the drugs in the bedroom were "hidden from view beyond [Banks'] knowledge." Aplt. Br. 19.

Intentionally or recklessly omitting information from an affidavit when that information would negate probable cause violates the Fourth Amendment. *See Taylor*, 82 F.3d at 1562. So when an "affidavit contains intentional, knowing[,] or reckless omissions," the reviewing court must determine the existence of probable cause by adding in the omitted facts and determining whether the warrant "would have issued in a but-for world where the attesting officer faithfully represented the facts." *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015).

Here, even if we assume that McRorie intentionally or recklessly failed to mention that that the drugs were hidden from Banks' view, we would find no error. That's because the warrant would have issued even if McRorie had included that particular detail. It remains the case that police found Banks in a room in which they also found cocaine base, although the cocaine wasn't in Banks' immediate view. That fact, combined with the remainder of the affidavit, including the informants' reports,

9

sufficiently established probable cause to believe that Banks had committed a drug-related crime. *See Wolford*, 78 F.3d at 489.

Banks also argues that the affidavit improperly rested upon McRorie's own summaries and conclusions about Banks' involvement in the drug-trafficking organization. Banks is correct that "a warrant must be supported by *facts* demonstrating probable cause, not by police summaries of what they have concluded from such facts." *United States v. Roach*, 582 F.3d 1192, 1203 (10th Cir. 2009). But Banks' two-sentence argument on this point—which ignores both (1) the three informants' reports and (2) law enforcement's independent investigation of those reports—is too cursorily briefed to provide a basis for reversing the district court. *See* Fed. R. App. P. 28(a)(8)(A) (noting that "the argument . . . must contain . . . appellant's contentions and the reasons for them"). Thus, we consider this argument waived. *See Bronson v. Swenson*, 500 F.3d 1099, 1104 (10th Cir. 2007) (refusing to consider arguments that are inadequately briefed).

In sum, as the district court concluded, McRorie's affidavit provided a substantial basis for the state court to determine that probable cause existed to arrest Banks.

*Ping Order*

Law enforcement arrested Banks in Spencer in the early morning hours of November 29, 2014—two weeks after the state court issued the arrest warrant. They located Banks by asking T-Mobile to ping his phone and determine its current location. Banks argues that this ping was improper for a variety of reasons and that

10

the district court should have suppressed the evidence stemming from it. We begin with a summary of the events leading up to the ping.

On November 28, a former member of the Rollin 90s and an informant working with law enforcement contacted McRorie. The informant told McRorie about a threatening phone call from Banks, in which Banks said that he and his "home boys" were going to "come down and shoot [the informant] up." R. vol. 3, 45. In the background of Banks' call, the informant heard Tyree Cade make additional threats. The informant gave McRorie the cell-phone number that Banks called from. McRorie relayed these threats to other officers who had been searching for Banks and Cade. Those officers prepared an affidavit asking the state court to issue a ping order so that law enforcement could gather location data from Banks' phone.

The state court issued the ping order after concluding that the affidavit met the standards set out in the Stored Communications Act (SCA) of 1986, 18 U.S.C. §§ 2701–12. *See* 18 U.S.C. § 2703(d) (allowing courts to order communication providers to disclose certain stored records to governmental entities "if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe" that the information sought is "relevant and material to an ongoing criminal investigation"). The order required T-Mobile to disclose subscriber information including historical and real-time CSLI and to determine, in real time, the location of Banks' cell phone.

Sergeant Monte Stephens testified that he served the ping order on T-Mobile just before 10 p.m. on November 28. But a T-Mobile representative said the office

was "done processing" "normal ping orders" until the following Monday. R. vol. 3, 80. Stephens then submitted an exigent-circumstance form to T-Mobile. On the form, Stephens described the emergency created by the threat to the informant: "Subject has been making threats to a state[']s witness with this phone number. He is armed and dangerous. Threat should be considered credible due [to] the suspect[']s involvement with a known criminal street gang." R. vol. 2, 34 (sealed). Stephens also checked a box on the form indicating that the emergency "render[ed] it unfeasible to obtain a search warrant or probable cause court order." *Id.*

Stephens received the "first ping at 12:15 a.m. on the morning of [November] 29th." R. vol. 3, 81. The ping identified the location of Banks' cell phone as at or "within three meters" of an address in Spencer. R. vol. 3, 114. The officers ultimately found Banks at this address and arrested him.

Before trial, Banks moved to suppress all evidence seized as a result of his arrest, arguing (1) that the ping order wasn't supported by probable cause and (2) that the district court's decision to issue the ping order ran afoul of the SCA and Oklahoma law. In response, the government argued that (1) probable cause existed; (2) even if it didn't, exigent circumstances justified pinging Banks' phone; and (3) the district court followed the SCA and Oklahoma law when issuing the ping order. The district court construed Banks' motion as asserting only violations of the SCA and Oklahoma law. And because suppression isn't an available remedy for such violations, it denied Banks' motion. *See United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008) (explaining that SCA provides statutory remedies for SCA

12

violations and that nonconstitutional "violations of the [SCA] do not warrant exclusion of evidence"); *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (stating that exclusionary rule only applies to violations of federal constitution, not violations of state law).

On appeal, Banks and the government exchange a variety of arguments about the ping order, the exigent-circumstances form, and the legal standards governing the methods used to locate Banks. We begin our analysis with the Fourth Amendment, which prohibits the government from performing unreasonable searches and seizures. U.S. Const. amend. IV. In so doing, we assume, without deciding, that pinging Banks' phone was a search under the Fourth Amendment.[3]

---

[3] Neither Banks nor the government adequately briefs the question of whether the ping in this case is a search. The government doesn't address the issue at all. And although Banks does, he relies on a Fourth Circuit case that is no longer good law. *See United States v. Graham*, 796 F.3d 332 (4th Cir. 2015), *rev'd* 824 F.3d 421 (4th Cir. 2016) (en banc), *petition for cert. filed* Sept. 26, 2016 (No. 16-6308). So neither party provides a useful discussion of this issue: they cite no helpful cases and provide no clear description of the technology used to determine Banks' location. And our independent research shows that this issue—i.e., whether pinging a phone to determine its current location is a search under the Fourth Amendment—remains an open question in this circuit.

The answer to that question may turn on the type of technology used. We have held that the Fourth Amendment doesn't apply to the government's requests for historical CSLI from third-party cell-phone providers because cell-phone users lack a reasonable expectation of privacy in that data. *See United States v. Thompson*, 866 F.3d 1149, 1160 (10th Cir. 2017), *petition for cert. filed* Sept. 11, 2017 (No. 17-5964); *id.* at 1155 (citing and discussing cases from Fourth, Fifth, Sixth, and Eleventh Circuits that reach same result). And the Supreme Court seems poised to weigh in on this CSLI issue. *See United States v. Carpenter*, 819 F.3d 880, 885–90 (6th Cir. 2016), *cert. granted*, 137 S. Ct. 2211 (2017). But third-party service providers collect CSLI in the ordinary course of business, and it's not clear that the analysis would be the same when law enforcement determines a phone's current,

A search or seizure is presumptively reasonable if it's based on a warrant supported by probable cause. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). But the Fourth Amendment itself doesn't require a warrant—it requires reasonableness. *Id.* As a result, there are various exceptions to the warrant requirement. *Id.* One such exception is for exigent circumstances: "We have previously applied the 'exigent circumstances' exception . . . when the circumstances posed a significant risk to the safety of a police officer or a third party." *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006). Exigent circumstances exist when "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *Id.* at 718.

As the government contends, exigent circumstances justified pinging Banks' phone. According to law-enforcement officers' testimony at the suppression hearing, Banks called an informant and threatened to kill him, saying that he and his "home boys" were going to "come down and shoot [the informant] up." R. vol. 3, 44–45.

real-time location, either by asking the service provider to do so or by using technology of its own. For example, in *Jones v. United States*, 168 A.3d 703, 707 (D.C. 2017), the District of Columbia Court of Appeals held that law enforcement's use of a cell-site simulator (technology that simulates a cell-phone tower) to determine the current location of a person's phone constitutes a search under the Fourth Amendment. On the other hand, the Sixth Circuit has held that tracking a phone for seven hours in real time via GPS data doesn't amount to a search under the Fourth Amendment because a person "has no reasonable expectation of privacy against such tracking." *Riley*, 858 F.3d at 1013.

Given the unsettled nature of this question and the parties' inadequate briefing, we decline to decide this question here. Instead, we resolve Banks' appeal on other grounds.

Officers testified that they knew Banks was associated with a "violent street gang," and had a history of violent behavior. R. vol. 3, 61. So the threat to the informant provided an objective basis for the officers to believe that the informant needed immediate protection from Banks.[4] *See Najar*, 451 F.3d at 718. And the manner and scope of the resulting search was reasonable—the officers asked T-Mobile to ping Banks' phone to locate Banks, thereby reducing or eliminating the threat to the informant. *See id.* Thus, pinging Banks' phone was reasonable under the Fourth Amendment.

---

[4] Despite the absence of any argument from Banks in response to the government's exigent-circumstances assertion, we also note that the threatened informant's report was sufficiently reliable to establish the required "reasonable belief" about whether exigent circumstances existed. *Najar*, 451 F.3d at 719. The threatened informant wasn't anonymous, and he had previously provided law enforcement with reliable information. *See United States v. Brown*, 496 F.3d 1070, 1075 (10th Cir. 2007) (noting that issue turns on reliability of informant's information); *United States v. Tucker*, 305 F.3d 1193, 1200–01 (10th Cir. 2002) (noting that tips from known informants are more reliable than anonymous tips). Further, he reported contemporaneous, firsthand knowledge about being threatened, and such reports tend to be more reliable than delayed reports of secondhand information. *See Brown*, 496 F.3d at 1077–78. The contemporaneous report also suggests that the informant was motivated by fear for his own safety, which further enhances the reliability of his report. *See id.* at 1077 (noting reliability inherent in 911 call aimed at protecting a friend, which is "more analogous to a plea for help from a victim than to an informant's tip"). And while it's not clear from the record whether law enforcement corroborated the informant's report, such corroboration isn't always required for tips from known informants. *See Tucker*, 305 F.3d at 1201 (finding reasonable suspicion based on citizen-informant tip despite lack of police corroboration). Moreover, the informant's report about the threatening phone call aligned with law-enforcement's information that Banks and Cade were together and that Banks had a history of violent behavior. *See Brown*, 496 F.3d at 1078–79 (noting that police corroborated some details of tip). Thus, the informant's report provided law enforcement with a reasonable belief that exigent circumstances existed. *See Najar*, 451 F.3d at 718–19.

15

We reach this conclusion without considering the validity of the state-court ping order. The record demonstrates that the officers never actually executed the ping order—when officers presented the ping order, a T-Mobile representative advised them that the company had stopped processing "normal ping orders . . . for the weekend." R. vol. 3, 80. Instead, officers completed a separate exigent-circumstance form, which described the emergency created by the threat to the informant and clearly indicated that the emergency made it unworkable to obtain a search warrant. Because the state-court warrant was never utilized and because the search was otherwise justified under the Fourth Amendment, it's immaterial whether the state-court order was supported by probable cause or whether it complied with the SCA.

In summary, by challenging the lawfulness of the ping order, Banks raises an issue of first impression regarding whether tracking a cell-phone's real-time location is a search under the Fourth Amendment. But neither party adequately briefs that issue, so we decline to address it. Assuming that pinging Banks' cell phone was a search, it was justified by the exigent circumstances created when Banks threatened to kill the informant. Thus, the district court didn't err in denying Banks' motion to suppress the evidence that law enforcement found by pinging his phone.

*Protective Sweep*

After pinging Banks' phone, law enforcement found Banks at the Spencer house, where he peacefully surrendered after a one-hour standoff. The officers arrested Banks and then conducted a protective sweep of the home because they believed that Tyree Cade was inside. Although they didn't find Cade during the

16

sweep, they discovered other evidence in plain view, including guns and cocaine base in the attic and items in the kitchen connected to manufacturing cocaine base.

Banks asked the district court to suppress this evidence. The district court denied Banks' motion, concluding that the protective sweep was warranted because law enforcement reasonably believed that Cade was in the Spencer house and posed a danger to the officers and others. Specifically, the district court cited two facts supporting law enforcement's reasonable belief: (1) the threatened informant said that he heard Cade making threats, along with Banks, during the phone call a few hours earlier, and (2) during the standoff, law enforcement saw the gutters shake, suggesting that someone went into the attic.

On appeal, Banks first asserts that the sweep wasn't reasonable under the Fourth Amendment and thus the district court should have suppressed the evidence the officers found in plain view. For the reasons discussed below, we disagree.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). This type of search is limited to a "cursory visual inspection of those places in which a person might be hiding." *Id.* A protective sweep is only justified and constitutionally permissible if the officers had reasonable suspicion, based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. The sweep should "last[] no longer than is necessary to dispel the

17

reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.

Banks argues that the officers lacked the required reasonable belief that Cade was in the Spencer house and posed a danger to the officers. He first questions the officers' credibility, characterizing their statements about the threatened informant as a "fairy tale created after the officers discovered cocaine base and two guns in the attic." Aplt. Br. 30. But on appeal, we view the facts in the light most favorable to the government. *See Hauk*, 412 F.3d at 1185. And here, those facts show that the officers reasonably believed that Cade (1) was with Banks on the day of Banks' arrest, (2) might have been hiding in the attic of the Spencer home, and (3) was dangerous.

Specifically, Detective McRorie testified that the threatened informant "said that he could hear who he believed to be Tyree Cade in the background [of the November 28 call with Banks] making threats as well." R. vol. 3, 46. Moreover, at that time, the officers had previously received information that Cade and Banks were seen together at one or more local hotels. So officers reasonably believed that Cade and Banks were together on this particular day.

Then, when the officers arrived at the Spencer house, they heard multiple individuals inside. They reasonably believed one of them might be Cade, as just detailed. And during the hour-long standoff, the officers watching the back of the house heard what they believed were sounds of people moving into the attic and saw the gutters on the house moving. So they reasonably believed that someone, possibly Cade, was hiding in the attic.

18

Further, one officer testified that he knew of Cade's history of violent behavior, Cade's gang membership, and that Cade "[didn't] like the police at all." R. vol. 3, 83. These details, along with the fact that Cade had recently threatened the informant during the call, provided reason to believe that Cade was dangerous.

It's true that when Banks and his two girlfriends eventually came out of the house and were arrested, they told the officers that no one else was inside. But those statements didn't dispel the officers' otherwise reasonable belief that Cade might be in the house and, particularly, in the attic. Instead, for the reasons discussed above, the officers had "specific facts giving rise to the inference of a dangerous third person's presence" in the home. *United States v. Nelson*, 868 F.3d 885, 889 (10th Cir. 2017). And that distinguishes this case from those in which officers merely had no reason to believe there *wasn't* a dangerous person inside the house. *See, e.g.*, *id.* (noting that although it's always possible that "there could . . . be a dangerous person concealed within a structure," that possibility alone can't "justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course"; "[a] mere *absence* of information about whether anyone remains in a home does not justify a protective sweep" (first quoting *United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004); then quoting *United States v. Roof*, 103 F. App'x. 652, 658 (10th Cir. 2004) (unpublished))).

Banks next argues that the protective sweep was improper because the officers arrested him *outside* of the Spencer house; he insists that a protective sweep is only permitted following an arrest made *inside* a residence. But he ignores our caselaw

holding otherwise: "Although it is true that *Buie* involved an in-home arrest, courts have recognized that the same exigent circumstances present in *Buie* can sometimes accompany an arrest just outside of a residence or other structure." *United States v. Cavely*, 318 F.3d 987, 995–96 (10th Cir. 2003). Other courts have reached the same conclusion. *See, e.g.*, *United States v. Watson*, 273 F.3d 599, 603 (5th Cir. 2001) ("A protective sweep of a suspect's house may be made 'even if the arrest is made near the door but outside the lodging' if the arresting officers 'have reasonable grounds to believe that there are other persons present inside who might present a security risk.'" (quoting *United States v. Merritt*, 882 F.2d 916, 921 (5th Cir. 1989))); *United States v. Colbert*, 76 F.3d 773, 776–77 (6th Cir. 1996) ("We decline to adopt a bright-line rule that prohibits police officers from conducting a protective sweep of a home every time they arrest a defendant outside that home, regardless of the potential danger from other persons inside."); *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995) ("Although *Buie* concerned an arrest made in the home, the principles enunciated by the Supreme Court are fully applicable where, as here, the arrest takes place just outside the residence."). Moreover, *Buie* isn't expressly limited to arrests inside the home. And it allows protective sweeps based on a reasonable belief that "the area to be swept harbors an individual posing a danger *to those on the arrest scene*." 494 U.S. at 334 (emphasis added). Further, although a sweep should last "no longer than it takes to complete the arrest and depart the premises," officers are also "permitted in such circumstances to take reasonable steps to ensure their safety *after*, and while making, the arrest." *Id.* at 336 (emphasis added).

20

For example, in *Cavely*, officers arrested the defendant just outside of the back door of the residence, and the defendant said that he had a friend inside the house; when officers asked to go inside, the defendant said, "If you holler, he'll come out." 318 F.3d at 994. The officers then entered the house through the back door, announced their presence, received no response, proceeded through the house, and found a man in the living room. *Id.* at 994–95. During this sweep, they saw evidence of methamphetamine manufacturing in plain view. *Id.* On appeal, we held the sweep was reasonable because the evidence "showed specific facts that would warrant a reasonable officer to believe that appellant's home harbored an individual posing a danger to the officers or others on the arrest scene." *Id.* at 996. Specifically, the officers—who had reason to believe that a person was in the house—"were just outside of the back door in an area where they could have been vulnerable to an attack from someone inside." *Id.*

The facts precipitating the protective sweep here are substantially similar to the facts precipitating the protective sweep in *Cavely*. After the hour-long standoff, officers "talked [Banks] out" and arrested him just outside the house. R. vol. 3, 91. And officers had reason to believe that Cade was with Banks on this particular evening, based on the threatening phone call to the informant. They also knew that individuals in the house initially barricaded themselves in the house and turned off all the lights. And during the standoff, officers heard sounds and saw rain gutters move in a way that suggested someone entered the attic. While the officers weren't expressly told that someone else was in the house, their suspicion that Cade was

21

inside was reasonable. *See Cavely*, 318 F.3d at 996. Further, the officers had reason to believe that Cade was dangerous, because they knew Cade had a history of behaving violently and of failing to comply with law enforcement. *See Fishbein ex rel. Fishbein v. City of Glenwood Springs*, 469 F.3d 957, 962 (10th Cir. 2006) (noting that focus of inquiry is reasonableness of officers' belief that they were in danger; finding that inquiry was satisfied when officers arrested parents and knew teenage son could be in house and could be armed). Given the circumstances, the district court didn't err in concluding that the protective sweep was reasonable.

But that doesn't end our analysis. Banks further suggests that even if the sweep was reasonable, the district court erred in not suppressing evidence of two particular items that law enforcement found in plain view during that sweep: Banks' wallet, found on a couch; and a black Oster bag containing over $17,000, found in a bedroom closet.

Generally, officers can seize any incriminating items that they find in plain view during a protective sweep. *See Horton v. California*, 496 U.S. 128, 135 (1990) ("Where the initial intrusion that brings the police within plain view of [an article of incriminating character] is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate."). But a protective sweep is specifically limited to looking in places where a person could be hiding. *See Buie*, 494 U.S. at 327. So Banks argues that officers erred by opening up the wallet and the Oster bag during the sweep.

As common sense tells us (and as an officer testified), neither the wallet nor the Oster bag can contain a person. As such, we agree with Banks that the officer shouldn't have opened the wallet during the sweep. But this error was harmless because neither the wallet nor anything found in it were introduced at trial.

Conversely, no error occurred in relation to the Oster bag. Contrary to Banks' suggestion, the officers didn't open the Oster bag during the sweep. They simply saw it in plain view while looking in a bedroom closet. And they seized it because it was related to the Oster hand mixer box and the metal beaters with white residue found in the kitchen; they suspected that the mixer was used to manufacture cocaine base, and therefore believed the mixer's packaging might also contain evidence of manufacturing. *See Horton*, 496 U.S. at 135 (noting that police can seize incriminating items in plain view). Then, after seizing the bag, an officer later performed a permissible inventory search and found the cash. *See United States v. Tueller*, 349 F.3d 1239 (10th Cir. 2003) ("[I]nventories 'are now a well-defined exception to the warrant requirement of the Fourth Amendment.'" (quoting *Colorado v. Bertine*, 478 U.S. 367, 371 (1987))). Thus, the district court correctly refused to suppress the evidence found in plain view during the reasonable protective sweep.

## Sufficiency Issues

Next, Banks challenges the sufficiency of the evidence supporting each of his 16 convictions. We have grouped Banks' convictions as relevant to his arguments.

We review the sufficiency of the evidence de novo. *United States v. Sparks*, 791 F.3d 1188, 1190 (10th Cir. 2015). In so doing, we "view the evidence in the light

23

most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Id.* at 1190–91. We won't reweigh the evidence or reassess witness credibility. *Id.* at 1191.

*Drug and Gun Possession*

Banks argues that the government failed to present sufficient evidence to support his convictions for four possession crimes. These counts required the government to prove, among other elements, that Banks *knowingly* possessed the cocaine found in the clothes hamper at Lillie Nelson's house and the cocaine and guns found in the attic at the Spencer house. *See* 21 U.S.C. § 841(a)(1) (possessing drugs); 18 U.S.C. § 924(c)(1)(A) (possessing gun in furtherance of drug crime); *Id.* § 922(g)(1) (possessing gun after being convicted of a felony).

Banks insists that the evidence was insufficient to prove that he knowingly possessed the cocaine found in the clothes hamper at the Nelson home in July 2014 because (1) he didn't live there, (2) there was no evidence that he had accessed the clothes hamper or the closet, (3) he only momentarily occupied the bedroom, and (4) the fact that he was smoking marijuana didn't establish that he knew about the cocaine in the hamper.

Generally, to prove possession, the government must show "'some nexus, link, or other connection between the defendant and the contraband' beyond mere co-occupancy of the premises." *Roach*, 582 F.3d at 1205 (quoting *United States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996)). "[M]ere proximity to illegal drugs, mere presence on the property where they are located, or mere association with persons

24

who do control them, without more, is insufficient to support a finding of possession." *United States v. Richard*, 969 F.2d 849, 856 (10th Cir. 1992) (quoting *United States v. Espinosa*, 771 F.2d 1382, 1397 (10th Cir. 1985)). In other words, the government must show some evidence, beyond mere proximity, that a defendant knew about the drugs. *Roach*, 582 F.3d at 1205.

Here, the government presented evidence—beyond Banks' mere presence in the room—that he knew about the drugs and that they belonged to him. Specifically, Banks told his mother, in a recorded jail call, that the drugs were his: he said that Evans had claimed responsibility for "[a]ll that shit, my shit." R. vol. 3, 570. Banks' mother provided somewhat inconsistent testimony about what Banks meant by this. But we must view the evidence in the light most favorable to the government. *See Sparks*, 791 F.3d at 1190–91. Here, that means overlooking the inconsistencies in Banks' mother's testimony and focusing solely on the part of her testimony that supported the government's theory of the case—that when Banks used the term "my shit," he meant "[d]rugs." R. vol. 3, 571.

Thus, Banks' arguments about not living in the Nelson house, his lack of access to the hamper, his momentary occupation of the bedroom, and the relevance of his marijuana use all fail. Viewing the evidence in the light most favorable to the government, including Banks' own statement that the drugs were his, a rational jury could have found that Banks knowingly possessed the cocaine found in Evans' bedroom.

25

Banks similarly argues that there was insufficient evidence to prove that he knowingly possessed the guns and cocaine found in the attic of the Spencer house in November 2014. But the evidence established that Banks had knowledge of and access to these items. For instance, Gabrielle Stevenson, one of Banks' girlfriends who was with him at the Spencer house, testified that she stayed with Banks in a hotel for at least a week immediately after she was released from prison in October 2014. She said Banks kept his "weed and crack" in the hotel room. R. vol. 3, 1927. She also saw Banks cook cocaine base in the microwave of the hotel room. And although Stevenson denied seeing him sell cocaine base out of the hotel room, she qualified her denial with an explanation that she "was always in another room." *Id.* at 1932.

Stevenson also testified that when Banks learned of his arrest warrant sometime in November 2014, she and Banks left the hotel to stay at the Spencer house. When law-enforcement officers arrived there, she told Banks "to break the guns down and flush all the dope in the house." *Id.* at 1939. She testified that by "dope" she meant the "crack" that she saw him retrieving from "different spots of the house." *Id.* at 1939–40. When Banks refused to flush the drugs, Stevenson advised him to hide them in the attic. She then helped him access the attic and told him to throw the drugs toward the back of the attic. Finally, although she denied seeing Banks with guns, she said that she assumed there were guns in the house.

In sum, Banks essentially asks this court to reweigh conflicting evidence and reassess Stevenson's credibility. But our role is limited to determining whether,

26

viewing the evidence in the government's favor, "a rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *See Sparks*, 791 F.3d at 1190–91. Stevenson's testimony alone supports the jury's determination that Banks had knowledge of and access to the drugs and guns in the attic. Moreover, Stevenson's testimony is consistent with testimony from other witnesses. One officer saw figures moving in the house after he knocked on the door and identified himself. Two other officers covering the back of the house heard "clattering," R. vol. 3, 1005, from inside the house that sounded like people "moving furniture or climbing around stuff," *id.* at 1011, and the officer who later swept the attic testified that he had to move furniture to get into it. The officers in the back also saw the house's rain gutters shake, which is consistent with someone moving around in the attic. Based on this evidence, the jury could have rationally concluded that Banks knowingly possessed the guns and cocaine base found in the attic. Sufficient evidence therefore supported Banks' convictions for these four possession crimes.

*Drug Manufacturing*

Banks next challenges the sufficiency of the evidence supporting his conviction for manufacturing cocaine base. On this count, the government had to prove that Banks knowingly and intentionally manufactured cocaine base. *See* 21 U.S.C. § 841(a)(1). Banks attacks the circumstantial nature of the government's evidence: he argues that this conviction rests solely on the discovery of common kitchen items and that the jury could have concluded these items were used to make waffles, not cocaine base.

The government can, and ordinarily does, prove knowledge and intent through circumstantial evidence. *See, e.g.*, *United States v. Camick*, 796 F.3d at 1220 (10th Cir. 2015) (noting that "intent 'may be proven via circumstantial evidence; in fact, it is rarely established by other means'" (quoting *United States v. Nguyen*, 413 F.3d 1170, 1175 (10th Cir. 2005))); *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1408 (10th Cir. 1991) (holding that "abundant circumstantial evidence" supported jury's inference that defendant knowingly transported cocaine). And the circumstantial evidence in this case strongly supports the jury's verdict.

As we have mentioned, the officers conducting the protective sweep of the Spencer house found several items consistent with the manufacture of cocaine base. In the kitchen they found an Oster-brand hand-mixer box, sandwich baggies, a box of baking soda, a glass mixing bowl, two metal beaters from a hand mixer, and a digital scale; the last three items had white residue on them. True, such items could be consistent with waffle-making—but the scale tested positive for cocaine base.

28

Further, officers found other evidence in the house consistent with drug crimes. In a bedroom closet, officers found a black Oster bag containing over $17,000 in cash. And in the attic, officers found approximately 496 grams of cocaine base, including one "cookie," suggesting a recent manufacture of cocaine base.[5] R. vol. 3, 622. Moreover, during the course of the trial, the jury heard evidence that Banks sold drugs, particularly cocaine base; that Stevenson saw Banks cook cocaine base in a microwave, using many of the same items found in the kitchen of the Spencer house; and that Banks had a prior conviction for possessing with intent to distribute cocaine base. Viewed in the government's favor, this evidence was sufficient for a rational jury to conclude that Banks manufactured cocaine base.

### Drug Conspiracy

Next, Banks challenges the sufficiency of the evidence supporting his conviction for conspiring to commit drug crimes. On this count, the government had to prove, through direct or circumstantial evidence, that (1) at least two alleged conspirators agreed to distribute or possess with intent to distribute more than 280 grams of cocaine base, (2) Banks knew the essential objectives of the conspiracy, (3) Banks knowingly and voluntarily participated in the conspiracy, and (4) the alleged co-conspirators were interdependent. *See United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013). Banks says that "no evidence links his drug-dealing to

---

[5] According to trial testimony, a "cookie" is a solid that forms at the bottom of a mixing bowl when cocaine powder is converted to cocaine base by mixing the cocaine powder with baking soda and water and cooking the mixture in a microwave. R. vol. 3, 622. The "cookie" is then broken up into smaller pieces sometimes referred to as "rocks." R. vol. 3, 622, 624.

29

the drug manufacturing and distribution activities of Ingram and his associates."

Aplt. Br. 42–43. The trial record says otherwise.

An agreement to distribute cocaine base "may be informal and may be inferred entirely from circumstantial evidence." *Pulido-Jacobo*, 377 F.3d at 1129 (quoting *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004)). In this case, there's little doubt that Banks, Ingram, and Brown were in the business of selling drugs: Banks was arrested in residences containing distribution-level quantities of cocaine base twice in 2014, and his own mother told the jury that he sold drugs for a living. Ingram and Brown were likewise arrested together with a distribution-level amount of crack in February 2015.

That these three conspired to sell drugs is borne out through other evidence, including their frequent contacts with one another. See *United States v. Sells*, 477 F.3d 1226, 1236 (10th Cir. 2007) ("An agreement 'may be inferred from the facts and circumstances of the case,' including 'frequent contacts among the defendants and from their joint appearances at transactions and negotiations.'" (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992))). Banks argues that "[t]here is no common physical location where [he] and the others operated from." Aplt. Br. 43. But Banks' argument overlooks other evidence connecting these men: Banks went to Las Vegas and Los Angeles with Ingram and Brown; law enforcement found a picture of Banks with Ingram and Brown at the Spencer house, where drugs and large quantities of cash were also found; and Banks expected Ingram to bail him out of jail

30

after he was arrested in July 2014. Additionally, Banks and Ingram were both long-time members of the Rollin 90s.

Further, when Ingram and Brown went to California in November 2014, Banks provided Ingram with money—money the jury could reasonably infer came from the sale of cocaine, as Banks had almost no legitimate income. And Stevenson, Banks' girlfriend, testified that on or around November 20, 2014, she sent money orders to California at Banks' direction, using money that Banks gave her. She also deposited $4,000 into Shavon Howell's Bank of America account at Banks' direction. Banks' other girlfriend, Watley, also testified that Banks directed her to make deposits into Howell's account. And Howell, who lived in California, testified that she provided her account information so that money for Ingram could be deposited there and that she cashed money orders for Ingram at his direction. These points of intersection between the three men—the transfer of money from Banks to Ingram, their arrests with distribution quantities of cocaine, and their gang history—would allow a reasonable jury to infer the existence of an agreement between them to distribute and to possess with intent to distribute cocaine.

The record also supports the conclusion that Banks knew the scope and objective of the conspiracy and participated in that conspiracy knowingly and voluntarily. The evidence showed that both he and his co-conspirators were in the business of selling cocaine, which was the very purpose of the conspiracy. His actions—including selling drugs and sending drug proceeds to Ingram—furthered the objectives of the conspiracy, and thus proved that he knowingly participated in it.

*United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (stating that the jury can presume defendant is a knowing participant when defendant acts to further conspiracy's objective). And there's simply no evidence to suggest that Banks acted involuntarily.

Banks also argues that the evidence didn't establish the fourth element of conspiracy, interdependence. But this argument is undermined by the money trail leading from Banks in Oklahoma to Ingram in California: that trail establishes that Banks was an "integral" part of the "realization of a common, illicit goal." *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997). And the money didn't flow only one way; Banks expected Ingram to bail him out of jail in July 2014, thus reflecting an interdependent relationship. Overall, the evidence was sufficient for a rational jury to conclude that Banks was guilty of drug conspiracy.

*Money-Laundering*

Banks also challenges the sufficiency of the evidence supporting his conspiracy and substantive money-laundering convictions. These convictions were primarily based on (1) seven $1,000 postal money orders (three purchased by Stevenson and four by his mother) sent to addresses in California associated with Ingram; and (2) a $4,000 deposit made by Stevenson into a bank account belonging to Howell, Ingram's California associate. Banks' mother and Stevenson testified that they took these actions at Banks' direction. But Banks argues that the government

failed to prove that (1) the money derived from illegal drug sales, or (2) he knowingly tried to conceal or disguise the nature of those proceeds.[6]

Banks' sufficiency arguments largely ignore the evidence presented at trial. Aside from the testimony from Banks' mother and Stevenson, the jury also saw a text message from Howell—forwarded from Banks to Stevenson—that identified the relevant bank account, as well as a text message from Banks to Stevenson directing where to mail the money orders. The evidence showed the money was destined for Ingram, and testimony established that the money orders were cashed in a manner indicative of "structuring."[7] R. vol. 3, 2076. Moreover, there was evidence that this money was derived from drug sales: the jury heard testimony that Banks and Ingram sold cocaine and that neither man had a legitimate source of income. So the jury

---

[6] To prove conspiracy to commit money laundering, the government had to establish that (1) at least two alleged conspirators agreed "to knowingly conduct a financial transaction involving the proceeds of specified unlawful activity, with the intent to further specified unlawful activity," (2) Banks knew the essential objectives of the conspiracy, (3) Banks knowingly and voluntarily participated in the conspiracy, and (4) the alleged conspirators were interdependent. *United States v. Keck*, 643 F.3d 789, 794 (10th Cir. 2011).

On the substantive money-laundering charges, the government had to show that Banks "conducted or attempted to conduct . . . a financial transaction" while knowing both that (1) the property involved represented proceeds of unlawful activities and (2) the transaction was designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); *see also* 18 U.S.C. § 2 (imposing liability for aiding and abetting); *United States v. Contreras*, 108 F.3d 1255, 1264 (10th Cir. 1997). The government also had to prove that the money actually came from unlawful activity. *See* § 1956(a)(1).

[7] The term "structuring" means breaking down financial transactions "to avoid a filing requirement." R. vol. 3. 2076.

could reasonably infer that the money came from selling drugs. *See United States v. Hardwell*, 80 F.3d 1471, 1483 (10th Cir. 1996).

Banks' suggestion that there's no evidence he tried to conceal the transactions is similarly misplaced. He insists that "many men prefer not to go to the grocery store or the bank, and instead send their wives or girlfriends to handle such tasks." Aplt. Br. 47. As such, he maintains he wasn't trying to hide anything by using his girlfriends and mother to make these transactions. But these innocent scenarios bear little resemblance to the facts here. Banks used third parties to purchase blank money orders and to make deposits in other third-party bank accounts, thereby avoiding direct association with the transactions. The drug proceeds were effectively laundered—in other words, made to appear legitimate—when the postal money orders were purchased. Using third parties at this crucial juncture underscores Banks' effort to obscure the source of the proceeds. Banks also directed the money that was meant for Ingram to third-party addresses, further disguising the purpose of the transactions. Together, this presented a pattern of behavior from which a reasonable jury could conclude that Banks intended to conceal the nature, source, ownership, and control of the drug proceeds. *See Contreras*, 108 F.3d at 1264. Sufficient evidence supports Banks' money-laundering convictions.

### Witness Tampering

Banks also argues that the evidence wasn't sufficient to support his witness-tampering conviction. Specifically, he seems to suggest that in order to prove that he violated 18 U.S.C. § 1512(b)(1), the government had to demonstrate that he directly

34

threatened to physically harm Gilbert Jacobs. And he asserts that Jacobs explicitly disavowed any assertion that Banks ever "threaten[ed] . . . to hurt [him]." R. vol. 3, 1385. Thus, Banks seems to conclude, the evidence was insufficient to convict him of witness tampering.

But Banks cites no authority to support his suggestion that a direct threat of physical harm is an element of § 1512(b)(1). *See* Fed. R. App. P. 28(a)(8)(A) (noting that appellant's argument must contain "appellant's contentions and the reasons for them, with citations to the authorities"). And we know of no such authority. On the contrary, the plain language of the statute requires the government to prove only "intimidation, threat[s], or corrupt[] persua[sion]," or "misleading conduct toward another person"—not a threat of physical harm. *See* § 1512(b). In fact, witness tampering by threat of physical harm is a separate crime. *See* § 1512(a)(2) (prohibiting use of "physical force or the threat of physical force" with intent to delay or prevent testimony); *United States v. Murphy*, 406 F.3d 857, 860–61 (7th Cir. 2005) (noting that these are separate offenses). And we have previously affirmed a witness-tampering conviction under § 1512(b) that didn't involve any direct threats of physical harm. *See Sparks*, 791 F.3d at 1192–93. Accordingly, even if we assume that Banks didn't directly threaten to physically harm Jacobs, that doesn't automatically render the evidence insufficient to support Banks' conviction for witness tampering. Thus, we won't reverse his conviction on this basis.

Alternatively, Banks appears to make the curious assertion that when a victim disputes that a defendant committed a particular offense against him or her, the

evidence is necessarily insufficient to support a conviction for that offense. Here, Banks points out, defense counsel read this count of the indictment to Jacobs and asked Jacobs whether Banks committed that crime against him. Jacobs responded, "He didn't threaten me like he was going to hurt me or nothing." R. vol. 3, 1385. Citing this response, Banks insists that "a not guilty verdict [was] the only permissible outcome." Aplt. Br. 48.

We reject this argument for two reasons. First, as we explained above, a defendant need not directly threaten to physically harm a witness to commit the crime of witness tampering. Thus, even assuming the jury was required to accept Jacobs' statement that Banks didn't directly threaten to physically harm him, that wouldn't necessarily preclude the jury from convicting him of witness tampering under § 1512(b)(1). Nor would it preclude us from affirming that conviction on appeal. *See Sparks*, 791 F.3d at 1193. Second, and more fundamentally, we reject the underlying premise of Banks' argument. We know of no authority suggesting that when "a victim [testifies] the crime as charged did not happen, then a not guilty verdict" is "the only permissible outcome." Aplt. Br. 48. And Banks points to none.

In a related argument, Banks next challenges his tampering conviction by claiming that the evidence at trial constructively amended the indictment, resulting in a fatal variance requiring reversal. *See United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015) (noting that variance and sufficiency challenges are related). We review this issue de novo. *United States v. Moore*, 198 F.3d 793, 795 (10th Cir. 1999).

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States*, 442 U.S. 100, 105 (1979). In other words, the government can't charge one crime in the indictment and then prove a different crime at trial. Here, Banks insists that the government charged him with violating § 1512(a)(2), which prohibits the use of "physical force or the threat of physical force" with intent to delay or prevent testimony. And because Jacobs testified that Banks never "threaten[ed] . . . to hurt [him]," R. vol. 3, 1385, Banks insists that the government didn't prove witness tampering under § 1512(a)(2), resulting in a fatal variance.

We disagree. The indictment did not even mention § 1512(a)(2). Instead, it specifically identified the statutory subsection, § 1512(b)(1), and included the elements of that crime: (1) "knowingly attempt[ing] to intimidate, threaten, and corruptly persuade another person" (2) "to influence or prevent the testimony of that person in an official proceeding." R. vol. 1, 335; *cf. United States v. Washington*, 653 F.3d 1251, 1261 (10th Cir. 2011) (finding that indictment sufficiently charged witness tampering by citing to statute and listing its elements). Because the indictment charged Banks with violating § 1512(b)(1) and not § 1512(a)(2), his variance argument fails.

**Evidentiary Issues**

Next, Banks raises two evidentiary issues on appeal, challenging (1) the admission of testimony from government witnesses and (2) the admission of his prior drug-related convictions. We review a district court's evidentiary rulings for an abuse

37

of discretion. *United States v. Brown*, 200 F.3d 700, 708 (10th Cir. 1999). A district court abuses its discretion when its decision to admit or exclude evidence is arbitrary or obviously unreasonable. *See United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011). And even if a district court erroneously admitted evidence, we will only reverse if the error affected the defendant's substantial rights. *See* Fed. R. Evid. 103(a); *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (noting that non-constitutional errors, including errors in admitting or excluding evidence, are harmless unless they affect defendant's substantial rights).

*Overview Testimony*

Banks argues that the district court erred in admitting "summary witness[]" testimony about his membership and role in the Rollin 90s. Aplt. Br. 50. Specifically, he purports to challenge the "district court's decision to allow law[-]enforcement officers parading as 'summary witnesses' to influence the jury with their own theories about how the . . . gang worked and what part [Banks] played in it." Aplt. Br. 50. Because the thrust of Banks' challenge concerns the testimony of FBI Agent Mark Schweers, we will begin our analysis there.

Although Banks characterizes Schweers as a "summary witness[]," Aplt. Br. 50, he was actually an overview witness: he was the first witness to testify, and he provided an overview of the government's case, including the structure of the Rollin 90s and how the investigation began.[8] *Compare United States v. Brooks*, 736 F.3d

---

[8] Relatedly, Banks relies on cases involving officer-expert testimony rather than summary or overview testimony. *See United States v. Kamahele*, 748 F.3d 984

921, 930 (10th Cir. 2013) (noting that overview witnesses tend to testify early in trial and provide overview of government's case and evidence jury should expect to hear), *with id.*, 736 F.3d at 931 (stating that summary testimony "comes toward the end of a case and is used to repackage complex testimony or already-admitted evidence for the jury"). "Courts generally allow overview testimony to the extent it concerns how an investigation began, the law enforcement agencies involved, or the investigative technique used." *Id.* "But overview testimony is susceptible to abuse," such as when a witness testifies about a defendant's truthfulness or likelihood of being involved in a crime. *Id.*

Here, Schweers testified that the Rollin 90s had "a tiered structure, not unlike the military or police department, with a, for lack of a better term, 'general' at the head, captains, down to foot soldiers." R. vol. 3, 410. Over objections from Banks' attorney, Schweers identified Ingram as the leader and said that Banks was "kind of the tier right below Mr. Ingram" and was a "trusted lieutenant[] or captain[] within the organization." *Id.* at 412. Schweers indicated that the purpose of the Rollin 90s was "to fight back against other gangs or to make money in some capacity." *Id.* at 413–14. At that point, the district court read a limiting instruction to the jury, telling them that membership in a gang isn't a crime.

---

(10th Cir. 2014); *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). Because this case doesn't involve challenged officer-expert testimony, we find those cases inapposite. *See United States v. Ray*, 370 F.3d 1039, 1046 (10th Cir. 2004) (noting that Federal Rule of Evidence 702, which governs expert testimony, doesn't apply to summary testimony), *vacated on other grounds*, 543 U.S. 1109 (2005).

Schweers also testified about methods of investigation, describing pole cameras, GPS surveillance, drive-by surveillance, telephone records, confidential informants, and search warrants. Regarding the investigative limitations of telephone records, Schweers stated that it is "common among drug dealers . . . to have multiple phones or to change phones regularly." *Id.* at 421. On cross-examination, Banks' counsel made clear that Schweers' testimony was observational and based on secondhand information.

Banks argues that Schweers' overview testimony wasn't borne out by the remaining evidence presented at trial and allowed the government "to make its case through its 'summary witness' officer[]." Aplt. Br. 54. But we have previously allowed overview testimony to explain the individual roles in a criminal enterprise. *Brooks*, 736 F.3d at 931. And contrary to Banks' argument, other evidence supported Schweers' overview testimony. Several former gang members testified that Banks was a member of the Rollin 90s. And there was plenty of evidence that Banks sold drugs. For example, a former gang member testified that she saw Banks with distribution-level quantities of cocaine, and law-enforcement officers testified about Banks' two arrests in houses in which large amounts of cocaine were found. Schweers implied at one point, perhaps improperly, that Banks was a drug dealer. But this is immaterial because Banks' own mother likewise testified that Banks was "[s]elling drugs." R. vol. 3, 556.

On the whole, Banks hasn't pointed to anything in Schweers' testimony that went beyond the scope of permissible overview testimony. At no point did Schweers

offer an opinion about the trustworthiness of Banks or any upcoming witnesses. *See Brooks*, 736 F.3d at 930 (noting that overview testimony shouldn't go into trustworthiness). Nor did he express an opinion about whether Banks was guilty of the charged offenses. Thus, the district court didn't abuse its discretion in admitting Schweers' overview testimony.

Banks also complains, briefly, about testimony from Detective McRorie and four other law-enforcement officers. And it's true that some of McRorie's testimony, at least, came near the end of the trial and could be considered summary testimony. *See Brooks*, 736 F.3d at 931. But Banks doesn't develop an argument that McRorie's testimony exceeded the scope of permissible summary testimony. Nor does he develop any argument whatsoever about the testimony of the other four officers named in his brief.

We aren't required to fill in the blanks of a litigant's inadequate brief. So to the extent that we can construe Banks' arguments as challenging summary testimony from McRorie or the other four officers, we treat those arguments as waived and decline to consider them. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies"); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (noting that this court may deem an issue waived if it's inadequately briefed).

*Evidence of Prior Crimes*

Next, Banks asserts that the district court erred in admitting evidence of his prior convictions.

Before trial, the government provided notice under Federal Rule of Evidence 404(b) that it intended to introduce evidence of Banks' three prior Oklahoma convictions for drug-related offenses. Banks objected. In response, the government argued that any risk of prejudice could be mitigated by a limiting instruction and that the prior convictions were (1) admissible to show intent and knowledge, (2) relevant to Banks' pending charges, and (3) more probative than prejudicial. Neither party points to the district court's specific ruling on this issue. But the trial transcript indicates the district court "ruled that [the prior convictions were] coming in," and that Banks then stipulated to two prior drug convictions. R. vol. 3, 871. The court read the stipulation into the record, gave an appropriate limiting instruction, and then repeated that instruction after the close of evidence, as part of the other jury instructions.

Banks' argument that the district court erred amounts to a general attack on the use of Rule 404(b) to admit evidence of prior convictions. Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But evidence of prior crimes or wrongs can be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed.

42

R. Evid. 404(b)(2). Evidence is properly admitted under Rule 404(b) if (1) it's admitted for a proper purpose, (2) it's relevant, (3) the probative value isn't substantially outweighed by the risk of unfair prejudice, and (4) the court provides a limiting instruction if so requested by the defendant. *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988); *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000).

Citing *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014), Banks argues that "many circuit courts have begun to rethink how Rule 404 should be applied." Aplt. Br. 57. *Gomez* abandoned the traditional four-part test for admitting evidence under Rule 404(b) "in favor of a more straightforward rules-based approach," citing concerns about the admission of prior drug convictions in drug cases. 763 F.3d at 853. And Banks asserts that this court, in *United States v. Watson*, 766 F.3d 1219, 1236 (10th Cir. 2014), followed *Gomez*' lead.

But *Watson* doesn't discuss *Gomez*. Nor does it abandon *Huddleston*'s four-part test for reviewing the admission of Rule 404(b) evidence. *Cf. Gomez*, 763 F.3d at 853. Instead, *Watson* explicitly reaffirms that "[o]ur court has time and again held that past drug-related activity is admissible other-acts evidence under Rule 404(b) to prove . . . that the defendant had the knowledge or intent necessary to commit the crimes charged." 766 F.3d at 1237. And it further reaffirms that this court continues to apply the *Huddleston* four-factor test. *Id.* We thus reject Banks' argument that the traditional four-part Rule 404(b) analysis no longer applies in this circuit.

Applying that analysis, we next consider Banks' alternative argument that his prior convictions shouldn't have been admitted under *Huddleston*. Banks specifically challenges three of the four *Huddleston* factors. He insists (1) that his prior convictions weren't admitted for any proper, non-propensity purpose; (2) that the convictions are too remote to be relevant; and (3) that their probative value was substantially outweighed by the risk of unfair prejudice.

But proving knowledge or absence of mistake is a proper purpose for admitting Rule 404(b) evidence. And Banks' primary defense at trial was lack of knowledge—knowledge that he possessed distributable quantities of cocaine base on more than one occasion, knowledge that he participated in a drug conspiracy, and knowledge that he laundered drug proceeds for Ingram's drug-trafficking organization.

Nor were Banks' 2004 and 2005 convictions too remote to be relevant. Although the crimes at issue here didn't occur until around the fall of 2014, Banks was incarcerated for most of the intervening years—from July 2007 until September 2013. And we've previously indicated that older convictions are relevant under these circumstances. *See Brooks*, 736 F.3d at 940 (noting that six-year-old convictions were relevant to conspiracy charge because defendant and most of his conspirators had been in prison during intervening time); *United States v. Cherry*, 433 F.3d 698, 702 & n.4 (10th Cir. 2005) (noting that five-year-old drug-distribution conviction was relevant to subsequent drug-distribution charge when defendant had been in

44

prison during intervening years and "obviously had no opportunity to commit other distribution offenses").

Banks' argument about unfair prejudice also fails. He claims, without elaboration, that the probative value of his prior convictions was substantially outweighed by unfair prejudice. But again, Banks' primary defense at trial was his alleged lack of knowledge. So evidence of the prior drug convictions was particularly relevant to undermining that defense. And Banks points to nothing suggesting that hearing this stipulation unfairly prejudiced the jury against him. Further, although Banks makes no argument about the fourth *Huddleston* factor, we note that the court twice gave an appropriate limiting instruction. Thus, the district court didn't abuse its discretion in admitting Banks' prior convictions.

## Sentencing Issue

Finally, Banks argues that the district court committed procedural error by miscalculating his Guidelines sentence. We review alleged procedural errors for an abuse of discretion. *United States v. Cassius*, 777 F.3d 1093, 1096 (10th Cir. 2015). "Typically, this means 'we review de novo the district court's legal conclusions regarding the [G]uidelines and review its factual findings for clear error.'" *Id.* (quoting *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012)).

In one paragraph devoid of any specific facts or analysis, Banks asserts that (1) his "presentence report included drug quantities involving criminal conduct [he] had not participated in, involving the Ingram money and drug possession episodes," and (2) his "offense level should have been a 32." Aplt. Br. 59. He cites U.S.S.G.

45

§ 1B1.3 and *United States v. Melton*, 131 F.3d 1400 (10th Cir. 1997), which generally relate to calculating the Guidelines range for a conspiracy conviction. But he fails to explain how either authority supports his position that the district court committed procedural error in calculating the Guidelines range here. Accordingly, we find his procedural challenge waived and decline to consider it. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's opening brief to contain "appellant's contentions and the reasons for them"); *Garrett*, 425 F.3d at 840 (noting that this court may deem an issue waived if inadequately briefed).

## CONCLUSION

For the reasons explained above, we affirm Banks' convictions and sentence.

*United States v. Banks*, No. 16-6322,
**PHILLIP**, J., concurring and dissenting.

I join the majority opinion except for its approval of the protective sweep. I would conclude that the officers lacked the necessary articulable facts, and associated reasonable inferences, that would support a reasonable belief that a protective sweep would uncover a person endangering those at the arrest scene. And one step further, I would conclude that the sweep exceeded permissible bounds.

I.

On November 28, 2014, police received a telephone call from a confidential informant. The informant reported that earlier that day, while at a hotel in Norman, Oklahoma, Banks had accused him of being an informant. He further reported that Banks had later called him and threatened to gather his "home boys" to come "shoot up" the informant. The informant also reported that he thought he had heard Tyree Cade in the background making threats. The informant gave police the telephone number Banks had used to call him.

The majority opinion thoroughly spells out the events associated with the issuance of a state-court order to ping Banks's telephone and the submission of Officer Stephens's exigent-circumstances form to T-Mobile. Maj. op. at 11-12. Suffice it to say that about 12:15 a.m. on November 29, police received notice of a ping for the telephone number used by Banks to threaten the informant. The phone had pinged at a house on a dead-end street in a rural part of Spencer, Oklahoma. Because of the distance to Spencer, it took police until about 12:55 a.m. to collect together up near the house. In all, five officers

were initially present, one of whom was a deputy sheriff. (Two other deputies arrived later.) Two officers went to the back of the home to intercept anyone trying to flee in that direction. Officer Monte Stephens of the Oklahoma City Police Department sneaked to the front of the house and peered through the front window's thin curtains. Inside, he saw silhouettes of two women sitting on the living-room couch, one counting currency and handling a bundle of cash. Though a car was in the driveway, officers never ran its plates.

Officer Stephens made his way to the front door and knocked. Upon hearing the knock, a female asked who was there. Officer Stephens responded that it was the police. Through the door's frosted glass, Officer Stephens could see people head to a back bedroom. The female responded that she would not open the door until her mother returned. Officer Stephens heard a male voice say "What," the sole indication he had that a male was in the home. R. v. 3 at 87. Next, Officer Stephens heard furniture being moved in front of the door and saw the lights turn off.

About this time, the officers located in back of the home saw the rain gutters shake, leading them to believe that someone might be in the attic. During later testimony, the police acknowledged that they had no reason to suspect criminal activity inside the home and that its occupants were within their rights in not answering the door. There matters stood, for about an hour, until Banks's mother arrived. She had spoken to her son by telephone and urged him to come outside. Soon after her arrival, Banks peacefully surrendered to the police. Banks's two girlfriends soon followed, one carrying an infant. In response to police questions, all three of them declared that no one else was in the

2

house. The police arrested Banks and put him in a patrol car. Police put the two girlfriends in patrol cars, too.

Soon after this, police ran a protective sweep through the house. They justified the protective sweep by asserting safety concerns as well as a desire to arrest Cade on a warrant. On the former basis, police never specifically detailed how Cade would have presented a danger had they simply driven away with Banks in custody. On the latter basis, Detective McRorie testified that police were at the residence to arrest Banks and Cade and had been trying to serve arrest warrants on both men for the past two weeks. And Officer Stephens testified that the officers had "succeeded in half of their objective in apprehending the two fugitives at that point." R. v. 3 at 72.

Two teams of two officers entered the house. The house is one level, with a living room, kitchen, bathroom, and bedrooms. It also has an attic, accessible from a two-foot-square ceiling panel in a bedroom closet. The police took between ten to fifteen minutes to complete the sweep. During this time, they examined items obviously unconnected to a hiding Cade—for instance, they took time to examine a photograph on a kitchen counter, to go through Banks's wallet, and to identify and grab an Oster mixer bag from a bedroom closet. Officer Stephens described the protective search as one in which "we take each room and we systematically and thoroughly search it" and as a "thorough and slow, cursory search of the house for any type of subjects." R. v. 3 at 93.

At the end of the sweep, Sergeant Harrison Fincham looked into the attic. This required some maneuvering. Because the closet contained nothing to stand upon to reach the two-foot-square panel, police positioned furniture from the living room underneath

3

the attic panel. Even this wasn't enough. Sergeant Fincham still needed officers to hoist him to push the panel aside and lift his head into the attic to see its contents. Had Cade been waiting, especially if as dangerous as the police say, this could have ended tragically. As it was, though, Cade was nowhere in sight, and Sergeant Fincham saw in close proximity the guns and drugs later introduced at trial.

During this time, Banks and his two girlfriends remained in nearby patrol cars. Nothing in the record suggests that they were moved from what the government asserts was a dangerous scene. In fact, after the sweep ended, police brought Banks and his girlfriends back inside the house for interviews. Again from the record, I see nothing showing any concern that Cade might return from an errand or a night on the town.

## II.

As the majority notes, the lead case from the Supreme Court is *Maryland v. Buie*, 494 U.S. 325 (1990). There the Court laid down some guiding principles. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id*. at 327. The Court rejected the state court's ruling that a protective sweep violates the Fourth Amendment unless the police had "probable cause to believe that a serious and demonstrable potentiality for danger existed." *Id*. Instead, the Court concluded that the protective sweep would comply with the Fourth Amendment if the police had "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing . . . that the area swept

4

harbored an individual posing a danger to the officers or others." *Id*. (first alteration in original) (internal quotation marks and citation omitted).

In *Buie*, police obtained arrest warrants for two men wanted for an armed robbery. *Id*. at 328. After verifying that Buie was inside his home, police entered, fanning out over the first two floors. *Id*. One officer stood watch at the top of the basement stairs, shouting for anyone there to show his hands and come upstairs. *Id*. Buie did so. *Id*. The issue on appeal concerned what happened next. That same officer descended the stairs to see if anyone remained there. *Id*. In the basement, he noticed a red running suit on a pile of clothing, an outfit matching one worn by a robber. *Id*. The Court acknowledged that under *Payton v. New York*, 445 U.S. 573, 602–03 (1980), the police had "the right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found, including the basement." *Id*. at 330. But the Court further noted that "[o]nce he was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched." *Id*. at 333.

But another possible justification remained. The Court observed that police might reasonably fear an arrestee's harboring "other persons who are dangerous and who could unexpectedly launch an attack." *Id*. Here, the Court focused on the arrest's having occurred in the home—declaring associated risks there as at least the equivalent of risks encountered in on-the-street or roadside investigative encounters. *Id*. Addressing these dangers from in-house arrests, the Court noted that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of

5

unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.*

Recognizing the safety risks presented during in-house arrests, the Court announced a new Fourth Amendment rule in such circumstances: "incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. But beyond that, the Court held, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

Though the majority quotes some of this language to justify a protective sweep from an outside-a-house arrest, the quotes all pertain to "in such circumstances," meaning in-house arrests. *Id.* As mentioned, in-house arrests present unique dangers because the police are more exposed to ambush—usually they are unfamiliar with the home's layout. In my view, *Buie* speaks exclusively to in-house arrests. After all, it requires that protective sweeps necessarily have ended at a time "no longer than it takes to complete the arrest and *depart* the premises." *Id.* at 336 (emphasis added). I recite this not to say that *Buie* prohibits protective sweeps for out-of-house arrests but to emphasize that those arrests offer more limited bases to show the requisite danger than do in-house arrests.

6

Certainly our circuit has allowed protective sweeps even when the arrest occurs outside the house.[1] But in those cases the government has had stronger evidence than presented here to support its view that the safety of police and others was endangered. *See United States v. Cavely*, 318 F.3d 987, 994–96 (10th Cir. 2003) (affirming a protective sweep when the police had arrested the defendant outside the back door of his home while he was carrying Coleman fuel, a product sometimes used to manufacture methamphetamine; when the defendant had $4,000 in cash and some methamphetamine on his person; when police knew the home had been used to manufacture methamphetamine and had contained firearms; and when the defendant told them he had a friend still inside but no one answered when the police knocked on the door); *United States v. Tisdale*, 921 F.2d 1095, 1096-97 (10th Cir. 1990) (affirming a protective sweep when a parolee fled through a window, followed by the sound of three gunshots, because under these circumstances police reasonably could believe that "other dangerous people might be present or that defendant would return.").

Here, officers had insufficient reason to suspect that Cade was in the house and endangered them or others. Several hours had passed since Banks's threatening call to the informant. The informant hadn't even definitively identified Cade's voice as the one he heard in the background during Banks's threatening call. When Officer Stephens peered in the home's front window, he saw two females sitting on a couch, and he later heard the voice of one male. No officer bothered to run the license plate of the car in the driveway.

---

[1] Unlike some other circuits, we have required an arrest before authorizing a protective sweep. *See United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007).

Any shaking of the rain gutters occurred before Banks and his two girlfriends left the house. No one has explained how Cade would present a threat to the officers' safety if he were in the attic (the record doesn't say that a person could even see outside from the attic).[2] The officers obviously didn't think Cade was a threat to others—they kept Banks and his two girlfriends outside and brought them back inside to interview them after the sweep. No one testified that either Banks or Cade then possessed firearms. And if the police feared for their safety from Cade in the attic, it seems unlikely they would have had Sergeant Fincham remove the ceiling panel and stick his head into the attic, inviting serious injury or death.

In my view, the majority opinion markedly extends the circumstances in which we permit protective sweeps associated with outside-a-house arrests. I don't believe that the government established a reasonable suspicion of safety concern for the officers or for others. And I would not approve the slow, evidence-gathering protective search here. Even if the *Buie* standard applied full force for outside-a-house arrests, we would need look no further than the police's own testimony to know that the protective sweep was not "quick and limited" and "narrowly confined to a cursory visual inspection of those

---

[2] I am unpersuaded that the police acted to protect their safety and that of others by the protective sweep. I question why the police didn't just drive away after securing Banks in the patrol car. *See United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) (questioning whether a protective sweep would be needed if police could have put the defendant in the car and driven away).

places in which a person might be hiding."[3] *Buie*, 494 U.S. at 327.

---

[3] *See also United States v. Parra*, 2 F.3d 1058, 1066 n.4 (10th Cir. 1993) (citing *Buie*, the court declined to rely on the protective-sweep doctrine after noting that "the government cannot plausibly argue that the detectives believed that dangerous accomplices might have been hiding under the bed pillows[.]").